## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FEDERAL TRADE COMMISSION,

      Plaintiff,

vs.                                       No. CIV 07-352  JB/ACT
                                            **PUBLIC VERSION**[1]

PAUL L. FOSTER,
WESTERN REFINING, INC.,
and GIANT INDUSTRIES, INC.,

      Defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for a Preliminary Injunction, filed under seal on April 12, 2007 (Doc. 10).  The Court held a hearing on the motion on May 7-11, 2007.  The primary issue is whether Plaintiff Federal Trade Commission ("FTC") has demonstrated that it will likely be able to demonstrate in an administrative proceeding before an Administrative Law Judge that the proposed merger between Western Refining, Inc. and Giant Industries, Inc. will reduce the bulk supply of gasoline to thirteen northern New Mexico counties. Because the FTC has not shown that it will likely be able to demonstrate that the proposed merger will reduce the bulk supply of gasoline to northern New Mexico, the Court will not grant the requested preliminary injunction.

## FINDINGS OF FACT

### I.      INDUSTRY BACKGROUND.

      1.      Crude oil, the primary component of gasoline and other refined petroleum products,

---

[1] Portions of this document have been redacted to protect confidential information.

originates from wells in domestic and foreign oil fields.  See Defendants' Hearing Exhibits, CM (Bureau of Economics, The Petroleum Industry: Mergers, Structural Change and Antitrust Enforcement, dated August 2004) at 4, 129.  After drilling and extraction, crude oil is sent to refineries for processing into motor gasoline, diesel fuel, and other petroleum products.  See id. at 7.

2.     Crude oils from different fields often have different chemical compositions, densities, and sulfur content.  See id. at 4, 129.  Different crude oils yield different products:  lighter and sweeter (low sulfur) crude oils yield larger amounts of gasoline and jet fuel than heavy and sour (high sulfur) crude oils.  See id.

3.     Pipelines and ocean tankers generally transport crude oil to refineries, but barge, rail, and truck are also means by which crude oil may be delivered to refineries.  See id. at 6-7, 161-62.  Similarly, refined petroleum products, including gasoline, usually leave refineries via pipeline or ocean tanker, but barge, rail or truck may also be used to transport them. See id. at 7-8, 209 n.1, 221.

4.     Terminals provide local storage and bulk supply dispensing services for gasoline and other petroleum products. See id. at 9, 221-22.  Many companies own terminals, including refiners, petroleum marketers, pipeline companies, and other firms without refining operations.  See id. at 9, 222.  Terminal owners and operators either distribute gasoline by truck to retail gasoline stations or sell to independent wholesalers who truck it to such stations.  See id. at 209, 228.

5.     Terminals transfer product from the terminal storage tanks into trucks using dispensing equipment referred to as "racks."  Id. at 222.  The price of product sold at terminal racks is known as the "rack price."  Id.

6.     An exchange agreement is a common means for a supplier to send product to an area

it cannot supply independently and directly from its refinery. Under an exchange agreement, supplier A receives product from supplier B in a particular location, and supplier A supplies product at another location for supplier B. <u>See</u> Plaintiff's Hearing Exhibits, PX03520 (Examination of Scott Matthew, dated January 11, 2007) at 007-008 (25:24-26:4).

       7.     Bulk supply quantities are often referred to as "pipeline tender" quantities, a term based on the minimum amount of product that a pipeline operator will accept for transport. <u>See</u> Plaintiff's Hearing Exhibits, PX01200 (Chevron Pipeline Co., Rules and Regulations, dated December 1, 2004) at 003. In Albuquerque, bulk supply refers to pipeline tender quantities of 5,000 to 25,000 barrels of light petroleum product. <u>See</u> Plaintiff's Hearing Exhibits, PX04061 (Report of David G. Ownby) ¶ 11, at 6.

       8.     A barrel is the equivalent of forty-two gallons. <u>See</u> Plaintiff's Hearing Exhibits, PX01651 (Longhorn Partners Pipeline, L.P., Rules and Regulations, dated August 27, 2004) at 3; Plaintiff's Hearing Exhibits, PX04061 ¶ 9, at 5.

       9.     Light petroleum products are distinct in characteristics; for example, gasoline is used in spark-ignited combustion engines whereas diesel fuel is used in internal combustion engines. <u>See</u> PX04061 ¶¶ 10, 12, at 6.

       10.     A netback is the net value of the product after its sale minus the cost of its purchase and delivery. Refineries use netbacks to assess the profitability of supplying various markets. <u>See</u> Hearing Transcript at 389:14-19 (Morrison)(taken May 7-11, 2007).

       11.     ***[SEALED PORTION REMOVED]***.

II.     **THE PARTIES.**

A.     **THE FEDERAL TRADE COMMISSION.**

12.     Plaintiff FTC is an administrative agency of the United States Government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 to 58, with its principal offices at 600 Pennsylvania Avenue, NW, Washington, DC 20580.  The Commission is vested with authority and responsibility for enforcing, among other things, Section 7 of the Clayton Act and Section 5 of the FTC Act.  See Plaintiff's Proposed Findings of Fact No. 26, at 4, filed March 15, 2007 (Doc. 229)("Plaintiff's Proposed Findings").

B.     **WESTERN REFINING, INC.**

13.     Western Refining, Inc. is a publicly traded company organized and existing under the laws of the state of Delaware, with its principal place of business at 6500 Trowbridge Drive, El Paso, Texas 79905.  See Plaintiff's Hearing Exhibits, PX00020 (Western Refining, Inc., Form 10-K, filed March 8, 2007) at 004.

14.     Paul L. Foster, Western's Chairman of the Board, President, and Chief Executive Officer, founded Western in 1997.  See Hearing Transcript at 736:3-6; 755:2-6 (Foster).

15.     Other controlling Western stockholders include Western's Executive Vice President, Jeff Stevens, Western's Chief Administrative Officer, Scott Weaver, and Western's former Chief Operating Officer, Ralph Schmidt.  Like Foster, Stevens, Weaver, and Schmidt are members of Western's Board of Directors.   See Plaintiff's Hearing Exhibits, PX00020 at 028, 093.

16.     Western is an independent petroleum refiner.  See id. at 010; Hearing Transcript at 737:15-25; 742:24-743:2 (Foster).

17.     Western owns and operates a refinery in El Paso with a total crude oil throughput

capacity of approximately 124,000 barrels per day ("bpd").  <u>See</u> Plaintiff's Hearing Exhibits, PX00020 at 010, 014.

18.    Foster acquired the contract to manage the El Paso refining business of his former employer, Border Refining Company.  At Border, and subsequently at Western, Foster entered into an operating agreement with Chevron, under which Chevron operated the El Paso south-side refinery in conjunction with Chevron's refinery across the street.  Western initially bought the crude and sold the refined product from the refinery, but Chevron "turned the wrenches."  Hearing Transcript at 730:21-731:14; 734:1-735:13; 755:17-19 (Foster).

19.    Western purchased the refining assets relating to the south-side refinery, and later purchased the north-side refinery from Chevron in August of 2003. <u>See id.</u> at 734:1-13; Defendants' Hearing Exhibits, M (Purvin & Gertz, Inc., Valuation of the Western Refining Company and Giant Industries, Inc. Refining and Marketing Assets, dated January 25, 2007) at 13.  Today, Western operates both refineries as a single business unit.  <u>See</u> Plaintiff's Hearing Exhibits, PX00070 at 010; Hearing Transcript at 734:1-735:13 (Foster).

20.    Western grew its business operations and developed a successful business model by "staying lean."  Western sells product in very substantial quantities to large buyers or, in some markets, to independent wholesalers through terminal racks.  <u>See</u> Plaintiff's Hearing Exhibits, PX00020 at 027; Hearing Transcript at  742:24-743:2 (Foster).  Western owns no gasoline stations or other retail marketing assets in any geographic area.  <u>See</u> Plaintiff's Hearing Exhibits, PX00020 at 023.  In each market it supplies, Western carefully selected a trusted marketer to distribute product.  <u>See</u> Hearing Transcript at 731:15-732:9 (Foster).

21.    Over ninety percent of the products produced at Western's refinery consist of high

value transportation fuels, including gasoline, distillate (diesel), and jet fuel.  See Plaintiff's Hearing Exhibits, PX00020 at 010.

22.     Western supplies gasoline and other refined petroleum products primarily in the Southwest region of the United States.  See id.; Hearing Transcript at  737:15-25; 742:24-743:2 (Foster).  Specifically, from its refinery, Western supplies light petroleum products to El Paso and west Texas; Albuquerque, New Mexico; Tucson and Phoenix, Arizona; and Juarez, Mexico.  See Plaintiff's Hearing Exhibits, PX00020 at 015.

23.     Western sells most of the gasoline produced at its El Paso refinery in El Paso (thirty-five to forty percent), followed by Phoenix and Tucson (thirty-five to forty percent), and Mexico (ten percent).  See Hearing Transcript at 747:20-748:2 (Foster); 873:6-874:8 (Stevens).  Western sends about five percent of its total gasoline production (3,000 to 4,000 bpd) directly to Albuquerque.  See id. at 744:22-24; 747:13-19 (Foster).  Western's focus is "to get as many barrels as [it] can to Phoenix."  Id. at 747:20-748:2.

24.     Western's largest customers in 2006 were Chevron (approximately seventeen percent of Western's revenue), Defendant Giant Industries, Inc.'s subsidiary, Phoenix Fuel Company, Inc. (also seventeen percent of Western's revenue), and PMI, an affiliate of Mexico's state-owned petroleum company, PEMEX (approximately eleven percent of Western's revenue).  See Plaintiff's Hearing Exhibits, PX00020 at 015.

25.     Western does not own, operate, or have access to a terminal in northern New Mexico. See Hearing Transcript at 744:4-12 (Foster).

26.     All of Western's bulk supply into northern New Mexico is delivered via the Plains pipeline.  See Plaintiff's Hearing Exhibits, PX00020 at 015.

27.     From 2004 to 2006, Western's average annual revenues were $3.3 billion.  See id. at 034.

28.     In the fiscal year ending December 31, 2006, Western reported net sales of approximately $4.2 billion and total assets of $908.5 million.  See id. at 034, 036.

**C.     GIANT INDUSTRIES, INC.**

29.     Giant is a publicly traded company organized and existing under the laws of Delaware, with its principal place of business at 23733 North Scottsdale Road, Scottsdale, Arizona 85255.  See Plaintiff's Hearing Exhibits, PX00610 (Giant Industries, Inc., Form 10-K, filed March 1, 2007) at 004.

30.     Giant is a refiner and marketer of refined oil products with two refineries in New Mexico and a single refinery in Yorktown, Virginia.  See id. at 005.  In the Four Corners area, where Utah, Colorado, New Mexico, and Arizona converge, Giant owns and operates its Ciniza (near Gallup, New Mexico) and Bloomfield (near Farmington, New Mexico) refineries.  See id. at 010.

31.     Giant's Ciniza refinery has a crude oil refining capacity of 20,800 bpd; its Bloomfield refinery can refine 16,000 bpd of crude oil.  See id.  Giant's Yorktown refinery has a crude oil refining capacity of 61,900 bpd.  See id.

32.     The primary feedstock for Giant's New Mexico refineries is Four Corners Sweet, a locally produced crude oil.  See id. at 012, 027.

33.     Because of declining local crude oil production in the Four Corners area, Giant has been unable to obtain sufficient amounts of sweet crude oil to operate its New Mexico refineries at full capacity.  See id. at 027.

34.     Crude oil utilization rates at Giant's New Mexico refineries have declined

consistently over the last ten years, from seventy-two percent in 2002 to sixty percent in 2006.  See id..

35.    To increase its New Mexico refineries' utilization rates and productivity, Giant acquired an idle crude oil pipeline system in August 2005.  See id. at 027.

36.    Giant's new pipeline originates near Jal, New Mexico, and is connected to a Giant-owned and operated pipeline network that supplies crude oil directly to its New Mexico refineries. See id.

37.    When operational, the recently acquired pipeline will have sufficient crude oil transportation capacity to allow Giant to operate its Ciniza and Bloomfield refineries at full capacity. See id.

38.    Giant anticipates that its new pipeline will become operational during the second quarter of 2007.  See id. at 028.

39.    In August and September 2006, Giant contracted with TEPPCO Crude Oil, L.P. to acquire approximately 15,000 bpd of "Supersweet Crude Oil."  See Plaintiff's Hearing Exhibits, PX00608 (Letter from Mark Mexal to Joe Simon, dated August 25, 2006).

40.    ***[SEALED PORTION REMOVED]***.

41.    ***[SEALED PORTION REMOVED]***.

42.    Giant refines and markets petroleum products through various wholesale and retail channels, primarily in the Southwest -- in New Mexico, Arizona, and Southern Colorado -- and on the East Coast -- in Virginia, Maryland, and North Carolina.  See Plaintiff's Hearing Exhibits, PX00610 at 005.

43.    The gasoline produced at the Ciniza and Bloomfield refineries is primarily sold to

customers in the Four Corners area and in northern Arizona.  See  Hearing Transcript at 831:25-

832:3 (Matthew).  Nine percent of Giant's total gasoline output is delivered to Albuquerque.  See

Defendants' Demonstrative Exhibits, Slide 2.

44.     Giant has a terminal in Albuquerque.  See Hearing Transcript at 832:12-833:4

(Matthew).

45.     Giant accepts truck deliveries to its terminal.  Giant supplies northern New Mexico

from terminals at its Ciniza and Bloomfield refineries.  See Plaintiff's Hearing Exhibits, PX00610

at 010, 013.  Giant's New Mexico refineries cannot supply Giant's Albuquerque terminal or its

Flagstaff terminal directly by pipeline.  See id. at 014.  Giant delivers product to its storage terminals

in Albuquerque and Flagstaff, Arizona via truck.  See id.

46.     A single importing pipeline, the Plains pipeline, which ships product from El Paso

to Albuquerque, also supplies Giant's Albuquerque terminal.  See Plaintiff's Hearing Exhibits,

PX04000 (Declaration of John Russell, executed March 12, 2007) ¶7, at 3.  Giant ships bulk supply

into northern New Mexico from El Paso on the Plains pipeline -- a common-carrier pipeline that runs

from El Paso to Albuquerque, and, that Plains Pipeline, L.P. owns and operates.  See id. ¶¶ 3, 13 at

1, 5-6.

47.     Giant markets and distributes its gasoline and diesel fuel production through a variety

of sales channels.  It operates 155 retail gasoline service stations located throughout the Southwest.

See  Plaintiff's Hearing Exhibits, PX00610 at 006.   In Albuquerque, about eighty-five percent of

Giant's sales are to its own retail stations.  See Defendants' Hearing Exhibits, AF (Affidavit of Scott

Matthew, executed April 11, 2007) ¶7,  at 3.

48.     Giant's retail service stations receive a significant portion of their refined product

from Giant's New Mexico refineries.  See Plaintiff's Hearing Exhibits, PX00610 at 013; Plaintiff's

Hearing Exhibits, PX00635 (Strategic Planning Follow-up, dated August 23, 2006) at 006, 008.

49.    Giant's refined product operations are not limited to refueling.  See Plaintiff's

Hearing Exhibits, PX00610 at 014-016.  In addition to supplying its own retail gasoline stations,

Giant distributes gasoline at wholesale to jobbers and other branded and unbranded customers.  See

Hearing Transcript at 833:14-24 (Matthew).  Giant also owns three wholesale subsidiaries, Phoenix

Fuel Company, Dial Oil Company, and Empire Oil Company, that distribute and market gasoline

from Giant's New Mexico refineries, and from third-party refineries in Arizona, Colorado, Nevada,

New Mexico, Wyoming, and Texas.  See Plaintiff's Hearing Exhibits, PX00610 at 041.

50.    Giant also receives and markets refined products in Tucson, Phoenix, and El Paso,

under exchange agreements with Triage Oil Company, Shell Oil Company, and Chevron Products

Company.  See Plaintiff's Hearing Exhibits, PX03520 at 007-008 (25:12-28:23), 016 (61:2-62:4).

51.    From 2004 to 2006, Giant's average annual revenues were $3.4 billion.  See

Plaintiff's Hearing Exhibits, PX00610 at 041.

52.    In the fiscal year ending December 31, 2006, Giant reported net revenues of $4.2

billion and total assets of $1.2 billion.  See id. at 041-042.

## III.    THE WESTERN/GIANT RELATIONSHIP.

53.    Western and Giant have close, long-standing business ties.  In hand-picking its trusted

distributors, Western contracted with Wells Oil (Tucson), where Jeff Stevens was working; Phoenix

Fuel (Phoenix), and Trans Mountain Oil Company (El Paso) to market Western's products.  See

Hearing Transcript at 731:15-732:9 (Foster).  Phoenix Fuel later purchased Wells Oil; Phoenix Fuel

is now a subsidiary of Giant.  See id. at 731:22-732:1.  Western and Giant do not have a contract,

but rather have an oral agreement according to which Western offers to sell and ship gasoline and diesel to Giant on Western's access line time on the Plains pipeline.  See id. at 869:5-870:19 (Stevens).  Giant purchases from Western are shipped on Western's line time on the Plains pipeline. See id. at 746:17-25 (Foster); 832:24-833:4 (Matthew); 870:23-871:5 (Stevens).

54.     In 2006, Giant and Phoenix Fuel purchased more gasoline from Western to resell and distribute in Albuquerque than Giant itself provided to Albuquerque from its two New Mexico refineries.  See Defendants' Hearing Exhibits, AF, ¶ 8 at 3.  Western is the source of most of the gasoline that flows through the Plains pipeline into Giant's Albuquerque terminal, and which Phoenix Fuel resells.  See Hearing Transcript at 832:11-833:2 (Matthew).

55.     All of Western's bulk supply into northern New Mexico is delivered via the Plains pipeline.  See Plaintiff's Hearing Exhibits, PX00020 at 015.

56.     Western supplies products, including gasoline, to Albuquerque via the same pipeline Giant uses, the Plains pipeline.  See Plaintiff's Hearing Exhibits, PX04000  ¶¶ 3, 13, at 1, 5-6.

## IV.   INTERSTATE COMMERCE.

57.     Each defendant is engaged in commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act ¶ 2, at 2, filed April 12, 2007 (Doc. 1)("Complaint").

## V.   THE BULK SUPPLY OF GASOLINE TO NORTHERN NEW MEXICO.

### A.   THE RELATIVE ISOLATION OF NORTHERN NEW MEXICO.

58.     Because northern New Mexico is landlocked, neither barge nor marine tanker can be used to provide bulk supply.  See Plaintiff's Hearing Exhibits, PX00041 (Giant Presentation to

-11-

Moody's, dated March 24, 2004) at 021.

59.     Northern New Mexico also suffers some isolation from other means of gasoline supply because its importing pipelines generally do not directly intersect with pipelines from major refining centers other than El Paso.  See id.; Plaintiff's Hearing Exhibits, PX04061 ¶ 16, at 7.

60.     Northern New Mexico is supplied bulk quantities of gasoline by pipeline and tanker truck. See Plaintiff's Hearing Exhibits, PX03560 (Declaration of Jeff Stevens in Support of Defendants' April 12, 2007 Joint Memorandum Opposing the FTC's April 12, 2007 Motion for Temporary Restraining Order) ¶ 10, at 2;  Plaintiff's Hearing Exhibits, PX04063 (Expert Report of Halbert C. White, Jr., Ph.D., dated April 28, 2007) ¶ 31, at 8; Plaintiff's Hearing Exhibits, PX00020 at 010.

### B.     GIANT AND WESTERN.

61.     Giant's two New Mexico refineries and Western's El Paso refinery each produce and supply bulk quantities, measured in thousands of bpd, of gasoline to northern New Mexico.   See Plaintiff's Hearing Exhibits, PX00041 at 019; Plaintiff's Hearing Exhibits, PX04063 ¶ 31, at 8. Specifically, Giant and Western each produce regular, mid-grade, and premium unleaded conventional gasoline.   See Plaintiff's Hearing Exhibits, PX00009 (Western's Presentation to Standard & Poor's, dated May 25, 2005) at 011; Plaintiff's Hearing Exhibits, PX00609 (Giant Refining Intake/Outrun Statistics) at 001.

### C.     BULK GASOLINE SUPPLIERS WITH TERMINALS IN NORTHERN NEW MEXICO.

62.     Three pipelines and trucks are used to supply six area product terminals from Giant's refineries.  See Plaintiff's Hearing Exhibits, PX04061 ¶ 17, at 8-9.

63.     Five firms that own and operate refined product terminals in Albuquerque are capable of distributing gasoline to wholesale bulk supply customers:  Chevron Corp., Valero Energy Corp., ConocoPhillips, Holly Corp., and Giant.   See  Hearing Transcript at 192:24-193:12 (Ownby); 404:18-22 (Morrison).  Two additional firms, Royal Dutch Shell plc and Alon USA Energy, Inc., have secured long-term access rights to a terminal in Albuquerque.  See  Defendants' Hearing Exhibits,  BP (Letter Agreement between Shell and Giant, dated September 25, 2006); Defendants' Hearing Exhibits, ET (Alon USA Energy, Inc., Form 10-K, filed March 15, 2007) at 6.

64.     Chevron is the second largest integrated energy company in the United States.  From 2004 to 2006, Chevron's average annual revenues were $188 billion.  See Defendants' Hearing Exhibits, AP (Chevron Corp., Form 10-K, filed February 28, 2007) at FS-62.  *[SEALED PORTION REMOVED].*

65.     ConocoPhillips is an international, integrated energy company, and the fourth largest refiner in the world.  See Defendants' Hearing Exhibits, EQ (ConocoPhillips, Form 10-K, filed February 23, 2007) at 1; Defendants' Hearing Exhibits, EP (ConocoPhillips, Refining and Marketing, last updated March 29, 2006) at 1.  From 2004 to 2006, ConocoPhillips' average annual revenues were $166 billion.  See Defendants' Hearing Exhibits, EQ at 48.

66.     Terminals that ConocoPhillips and Nustar L.P.  (formerly Valero L.P.) own receive refined products from Valero's McKee refinery and ConocoPhillips's Borger refinery.  See Hearing Transcript at 447:7-15 (Morrison); Plaintiff's Hearing Exhibits, PX04061 ¶ 17, at 8-9; Defendants' Demonstrative Exhibits, Slide 8.

67.     Valero is the largest refiner in North America, with a total refining throughput capacity of 3.3 million bpd.  See Defendants' Hearing Exhibits,  BV (Valero website) at 2.  From

2004 to 2006, Valero's average annual revenues were $76 billion.  See Defendants' Hearing Exhibits, BQ (Valero Energy Corp., Form 10-K,  filed February 26, 2007) at 21.  Valero owns and operates a terminal in Albuquerque.  See Hearing Transcript at  436:14-16; 437:6-9 (Reid).

68.     Holly is a large petroleum company that provides gasoline and other petroleum products to, among other locations, northern New Mexico.  See Defendants' Hearing Exhibits, BA (Holly Corp., Form 10-K, filed February 28, 2007) at 11, 15-16.  From 2004 to 2006, Holly's average annual revenues were $3 billion.  See id. at 31.  Holly owns and operates terminals in Albuquerque and Moriarty, New Mexico, which is located thirty-five miles east of Albuquerque, that can receive product from its Navajo refinery via pipeline.  See Hearing Transcript at 190:24-25; 191:1-3 (Ownby); 485:11-20 (White).

69.     Shell is one of the largest oil companies in the world.  From 2004 to 2006, Shell's average annual revenues were $297 billion.  See Defendants' Hearing Exhibits,  BM (Royal Dutch Shell plc,  Form 20-F, dated March 7, 2007) at 4.  In the United States, Shell owns interests in seven refineries.  Shell's total U.S. refining capacity is 1.6 million bpd.  See Defendants' Hearing Exhibits, BL (Shell Website: Shell in the U.S.: About Us).  Although Shell does not have its own terminal in Albuquerque, Shell has secured long-term access to Giant's Albuquerque terminal.  See Hearing Transcript at 823:25-824:3 (Ericksen);  Defendants' Hearing Exhibits, BP.

70.     Alon is an integrated refining and marketing company operating throughout the Southwest.  See Defendants' Hearing Exhibits,  ET (Alon USA Energy, Inc., Form 10-K, filed March 15, 2007) at 2.  From 2004 to 2006, Alon's average annual revenues were $2 billion.  See id. at 31.  Although Alon does not have its own terminal in Albuquerque, Alon has secured long-term access to Holly's Albuquerque terminal.  See id. at 6; Defendants' Hearing Exhibits, FU (Storage

and Product Handling Agreement, dated February 21, 1997); Hearing Transcript at 500:1-25 (White).

### D.   PIPELINES SERVING NORTHERN NEW MEXICO.

71.    In addition to using trucks to supply northern New Mexico with light petroleum products from Giant's New Mexico refineries, bulk supply can be delivered into northern New Mexico via three different pipelines. See Plaintiff's Hearing Exhibits, PX04061 ¶ 17, at 8; Plaintiff's Hearing Exhibits, PX03560 ¶ 10, at 2.

72.    The three pipelines that deliver gasoline and other light petroleum products into northern New Mexico are: the Amarillo-to-Albuquerque ("ATA") pipeline, the Holly Energy Partners ("HEP") pipeline, and the Plains pipeline.  See Hearing Transcript at 189:1-2; 190:14-25; 191:1-3 (Ownby).  Each of these pipelines delivers directly from refineries or product terminals outside the Albuquerque area to one or more product terminals within the Albuquerque area.

73.    On average, it costs approximately 2.5 cents per gallon to transport light petroleum on any of the three pipelines running into Albuquerque.  See Plaintiff's Hearing Exhibits, PX04061 ¶ 17, at 8-9.

### 1.   ATA Pipeline.

74.    ConocoPhillips and NuStar L.P. jointly own the ATA pipeline, each holding a fifty percent interest, which supplies ConocoPhillips' and Valero's Albuquerque terminals with gasoline and other petroleum products.  See Hearing Transcript at 193:6-8 (Ownby); 381:13-21; 413:10-18 (Morrison); 435:1-436:16; 446:23-447:11(Reid); Defendants' Hearing Exhibits, EY (Investigational Hearing) at 31:11-32:4 (Morrison)(dated February 16, 2007).  In addition to those companies' shipments, the ATA pipeline also transports a small amount of Shell-purchased product from Valero in Amarillo, Texas.  See Hearing Transcript at 447:9-448:8 (Reid).

75.     The ATA pipeline has a throughput capacity of 37,000 bpd.  See Plaintiff's Hearing Exhibits, PX01300 (Borger Pipeline Allocation) at 001.

76.     ***[SEALED PORTION REMOVED]***.

77.     ***[SEALED PORTION REMOVED]***.

78.     ConocoPhillips has excess capacity on the ATA pipeline with which to ship additional product into Albuquerque.  See id. at 413:19-414:4.

79.     ***[SEALED PORTION REMOVED]***.

80.     ***[SEALED PORTION REMOVED]***.

**2.     HEP Pipeline.**

81.     The HEP pipeline delivers product to Holly's Moriarty terminal.  See id. at 486:8-489:25 (White).  Holly monitors the Albuquerque market, and if it saw more demand from its customers, it would be capable -- in a relatively short period of time -- of increasing its supply by sending more volume over the HEP pipeline.  See id. at 493:14-20; 497:16-498:1.

82.     Holly opened the HEP pipeline in 1999 to supply additional product to northern New Mexico.  See id. at 493:1-4; 496:6-15.  The Moriarty terminal was opened in 1999 and, in response to customer demand, Holly added gasoline to the mix of products offered at Moriarty in 2000.  See id. at 494:15-495:9.

83.     The current operating capacity of the HEP pipeline from Artesia, New Mexico to Moriarty is 24,000 bpd.  See id. at 488:13-14.  The attainable capacity of the pipeline, with minor modifications, is 45,000 bpd.   See id. at 486:11-17; 486:24-487:3; 497:16-498:1 (White); Defendants' Hearing Exhibits, BA at 12.  Holly is filling about half the space on the pipeline, leaving ample excess capacity.

-16-

84.    Of the approximately 24,000 bpd of product that is shipped on the pipeline to Moriarty, approximately 7,000 bpd of product continues on an extension of the line to Bloomfield, New Mexico. See Hearing Transcript at 487:2-12 (White).

85.    **[SEALED PORTION REMOVED]**.

86.    **[SEALED PORTION REMOVED]**.

3.    **Plains Pipeline.**

87.    The Plains pipeline, which Plains All-American Pipeline L.P. owns, originates in El Paso, and terminates in Albuquerque. See Defendants' Hearing Exhibits, BW (Plains All-American Pipeline L.P., Form 10-K, filed March 1, 2007) at 17. The capacity of the Plains pipeline is approximately 28,000 bpd, depending on the refined product being shipped. See Defendants' Deposition Designations at 99-115, filed May 14, 2007 (Doc. 223-2)(Deposition of John Russell, taken May 1, 2007) at 12:7-16 ("Russell Deposition").[2]

88.    Plains Pipeline, L.P., a subsidiary of Plains All-American GP LLC, owns three refined products pipelines, two of which originate in El Paso. See Plaintiff's Hearing Exhibits, PX04000 ¶ 3, at 1.

89.    Of the two pipelines beginning in El Paso, one runs south to the Unites States' border with Mexico and the other extends 257 miles north to Albuquerque. See id.

90.    The Plains pipeline transports to Albuquerque primarily a mixture of gasoline and diesel. Transportation of the current mix allows the pipeline to ship a nominal capacity of 28,200

---

[2]

    The deposition testimony of John Russell of Plains was played into the record, but to avoid duplication of effort by the reporter, the parties provided the designated excerpts from Russell's deposition. Russell's deposition is thus included as part of the trial record without transcription into the trial transcript.

bpd.  See id. at ¶¶ 4,5 at 2.

91.     The Plains pipeline delivers refined products from El Paso to four terminal stations in New Mexico.  The first delivery point is in Belen, New Mexico, which is approximately thirty-five miles south of Albuquerque, where diesel is delivered to the Burlington Northern Santa Fe ("BNSF") Railway terminal.  The pipeline then delivers refined products to three different terminals in Albuquerque, which Chevron, Giant, and Holly own, respectively.  See id. ¶ 7 at 3; Russell Deposition at 24:21-25:6.

92.     Giant and Western have been shippers on the Plains pipeline for several years.  See Plaintiff's Hearing Exhibit, PX0400 ¶ 13 at 5-6.

93.     In El Paso, the Plains pipeline receives product from the Western refinery and the HEP terminal, which the HEP pipeline links to the Holly and Alon terminals.  See Russell Deposition at 71:3-19; Hearing Transcript at 875:23-876:5 (Stevens).  The Longhorn terminal, a large facility capable of storing over a million barrels of product, is also connected to the Plains pipeline, and can receive supply from the Gulf Coast via the Longhorn pipeline.  See Russell Deposition at 15:14-20; 71:20-72:12;  Hearing Transcript at 875:23-876:7 (Stevens).

94.     Chevron, Western, Shell, Giant, and Holly are the current shippers on the Plains pipeline.  See Hearing Transcript at 488:15-489:1; 506:10-12 (White).  Although the pipeline generally runs full, each of these firms has prorationing rights, or "line time," to ship on the pipeline. See Russell Deposition at 17:9-18:21.  Unlike the other shippers on the Plains pipeline, Western does not own or operate a terminal connected to the Plains pipeline in northern New Mexico. See Hearing Transcript at 744:4-12 (Foster).

-18-

E.     **GASOLINE SUPPLIERS WITHOUT TERMINALS PROVIDING GASOLINE TO NORTHERN NEW MEXICO.**

1.     **Valero.**

95.     Valero operates eighteen refineries, sixteen of which are located within the United States. See id. at 445:10-13 (Reid); Defendants' Hearing Exhibits, BQ at 3.  Among its refineries, Valero owns and operates the McKee refinery located in the Texas Panhandle.  See Hearing Transcript at 429:17-19 (Reid); Defendants' Hearing Exhibits, BQ at 7.  Valero markets both branded and unbranded transportation fuels on a wholesale basis through an extensive rack marketing system. See Defendants' Hearing Exhibits, BQ at 9.  Valero sells to approximately 3,850 branded distributor/dealer locations under the Valero, Diamond Shamrock and Beacon brands.  See id.

96.     Valero's McKee refinery has a crude oil refining capacity of approximately 164,000 bpd and is connected to the ATA pipeline, which moves product from Valero's refinery to its terminal in Albuquerque, where Valero supplies bulk gasoline to its customers in northern New Mexico.  See Hearing Transcript at 431:1-20; 435:4-436:16 (Reid); Defendants' Hearing Exhibits, BS at 10:25-11:22; 53:20-24 (Reid); Defendants' Hearing Exhibits,  EG (Declaration of Joseph P. Kalt, Ph. D., dated April 12, 2007) ¶ 25, at 14-16.

97.     In addition to Albuquerque, Valero supplies gasoline and other refined products to Denver, Colorado; Colorado Springs, Colorado; Turpin, Oklahoma; Lubbock, Texas, and Amarillo and El Paso.  See Hearing Transcript at 435:4-18 (Reid).  Valero ships approximately forty percent of its McKee refinery output south to El Paso and on into Arizona on the Kinder Morgan East pipeline. See id. at 443:8-15.

-19-

2.      **ConocoPhillips.**

98.     ConocoPhillips owns and operates twelve refineries in the United States, including its Borger refinery in the Texas Panhandle.   See Defendants' Hearing Exhibits, EQ at 23. ConocoPhillips' total U.S. crude oil throughput refining capacity is more than 2.2 million bpd.   See id.

99.     ConocoPhillips' refinery in Borger supplies light petroleum products to northern New Mexico.   See Hearing Transcript at 380:10-381:24 (Morrison).

100.    ConocoPhillips' Borger refinery has a crude oil refining capacity of approximately 124,000 bpd.   See Plaintiff's Hearing Exhibits, PX01304 (ConocoPhillips, Form 10-K, filed February 23, 2007) at 026.

101.    Effective January 1, 2007, Borger's refinery decreased from 146,000 to its current crude throughput capacity because of a downstream joint venture with Encana Corp., effective January 1, 2007.   See id.

102.    The Borger refinery produces a high percentage of light petroleum products which are shipped to west Texas, New Mexico, Colorado, and the mid-continent region.   See id. at 028.

103.    ConocoPhillips delivers its light petroleum products to northern New Mexico via a pipeline system that originates at its refinery.   See Plaintiff's Hearing Exhibits, PX01300 at 001.

104.    From the Borger refinery to a junction in Amarillo, ConocoPhillips uses a pipeline it wholly owns.   See id.

105.    The Borger refinery is connected to the ATA pipeline via a junction in Amarillo.   See id.; Hearing Transcript at 381:13-21; 413:10-18 (Morrison); 435:1-15; 436:14-16; 446:23-447:11 (Reid).

106.    From the Amarillo junction, ConocoPhillips delivers to its Albuquerque terminal via the ATA pipeline.  See Hearing Transcript at 381:13-15 (Morrison); Plaintiff's Hearing Exhibits, PX01300 at 001.

107.    In addition to shipping gasoline and other light petroleum products to northern New Mexico, the Borger refinery supplies Colorado on a line running north from its refinery and supplies Kansas, Missouri, and Illinois on its eastern running Gold Line.  See Hearing Transcript at 380:20-381:3 (Morrison).

108.    ConocoPhillips is expanding the Borger refinery and expects capacity to exceed contract sales by the middle of this year.  See id. at 402:4-15.

109.    Within northern New Mexico, ConocoPhillips supplies predominantly branded products to its company-owned stores and to branded wholesale customers. See id. at 383:1-384:3.

110.    ConocoPhillips is in the process of selling or is considering selling its stores.  See id. at 384:4-6.

111.    ConocoPhillips' customers are situated in the Albuquerque metropolitan area and areas surrounding Albuquerque.  See id. at 382:22-25.

112.    ConocoPhillips considers its transportation costs in determining whether to deliver products to northern New Mexico.  See id. at 410:1-7.

113.    With regard to transportation costs, ConocoPhillips considers whether the product is moving by pipeline or other means when determining which geographic markets to serve.  See id. at 410:12-17.

114.    In northern New Mexico, margins -- or netbacks -- have increased relative to other markets.  See id. at 417:21-418:1.

-21-

115.    Albuquerque is ConocoPhillips's top netback out of the approximately twelve markets it serves.  See id. at 389:10-390:4.

116.    ConocoPhillips has investigated adding stores with their existing marketers to grow business in Albuquerque.  See id. at 395:12-16.

117.    Expansion would be easier for ConocoPhillips if it were to find free-agent wholesale jobbers who are not under contract. See id. at 395:25-396:8.

118.    In the last three years, ConocoPhillips has tried to increase its supply into the market primarily through image rebranding.  See id. at 392:11-25.

119.    To the extent that ConocoPhillips primarily supplies branded gasoline to Albuquerque, which is supplied through long-term contracts, it has been difficult for the company to increase sales in any given period.  See id. at 395:25-396:4.

### 3.    Holly/Navajo.

120.    Navajo Refining, a subsidiary of Holly Corporation, has two refineries in southeastern New Mexico, one in Artesia and the other in Lovington, that are operated as a single unit.  The refinery has a combined refining capacity of approximately 83,000 bpd.  See Defendants' Hearing Exhibits, BA at 7.

121.    In 2006, Holly increased the capacity of its Navajo refinery from 75,000 bpd to its current capacity of 83,000 bpd.  See id. at 13.  Holly plans to further expand its refining capacity at Navajo to 85,000 bpd by the end of 2007, and 100,000 bpd by the end of 2008.  See id. at 13-14.

122.    **[SEALED PORTION REMOVED]**.

### 4.    Western.

123.    Western refined gasoline reaches Western's Albuquerque customers traveling from

El Paso to Albuquerque over the Plains pipeline.  See Defendants' Hearing Exhibits,  I (Western Refining, Inc., Form 10-K, filed March 8, 2007) at 9; Hearing Transcript at  744:22-24 (Foster). Western sends about five percent of its total gasoline production -- 3,000 to 4,000 bpd -- to Albuquerque on its own line time.  See Hearing Transcript at 744:22-24; 747:13-19 (Foster).

124.    Customers in El Paso purchase and deliver to Albuquerque on their own line time the remainder of the gasoline sourced from Western and delivered to Albuquerque. Customers that purchase from Western in El Paso and ship to northern New Mexico via their own Plains line time include Chevron, Holly, and Shell.  See Defendants' Hearing Exhibits, V (Declaration of Jeff Stevens in Support of Defendants' April 12, 2007 Joint Memorandum Opposing the FTC's April 12, 2007 Motion for Temporary Restraining Order, executed April 11, 2007) ¶¶ 19-20, 24, at 4-5.

### 5.    Chevron.

125.    Chevron has approximately 7,100 bpd of line time on the Plains pipeline.  See Defendants' Hearing Exhibits, GC at 39.

### 126.    *[SEALED PORTION REMOVED]*.

127.    It is not determinative whether Chevron is a northern New Mexico customer of Western.  Chevron transfers title and takes delivery of the product in El Paso, ships the product to Albuquerque using its own line time on the Plains pipeline, and dispenses the product to bulk-supply customers in northern New Mexico through its own proprietary terminal.  See Hearing Transcript at 871:23-872:14 (Stevens).

128.    The FTC has acknowledged that Chevron must be included as a bulk supply competitor.  See Plaintiff's Memorandum of Points and Authorities in Support of Motions for Temporary Restraining Order and Preliminary Injunction at 16, filed April 12, 2007 (Doc. 11).

Because it has its own rights to ship on the Plains pipeline, Chevron is not dependent on Western for its supply of gasoline. ***[SEALED PORTION REMOVED]***.

      **6.**      <u>**Shell**</u>.

129.     Shell has rights to ship on the Plains pipeline, and is thus able to purchase product in El Paso and send it to Albuquerque on its own line time. <u>See</u> Hearing Transcript at 824:4-23 (Ericksen). Shell has an agreement with Giant pursuant to which it may elect to receive between 85,000 and 110,000 barrels per month of gasoline from Giant in Albuquerque. <u>See</u> Defendants' Hearing Exhibits, BP. Shell also ships product from the Valero refinery to Giant's terminal on the ATA pipeline. <u>See</u> Hearing Transcript at 447:10-22 (Reid).

      **7.**      <u>**Alon**</u>.

130.     ***[SEALED PORTION REMOVED]***.

131.     ***[SEALED PORTION REMOVED]***.

      **8.**      <u>**Giant**</u>.

132.     Giant supplies petroleum products from its Ciniza and Bloomfield refineries to customers through product terminals located at each of its refineries, and through terminals in Flagstaff and Albuquerque. <u>See</u> Defendants' Hearing Exhibits, AD (Giant Industries, Inc., Form 10-K, filed March 1, 2007) at 9. Giant trucks product from its Ciniza and Bloomfield refineries to customers in Arizona and northern New Mexico. <u>See</u> <u>id.</u> at 9-10.

133.     Giant's refineries utilize a high quality, light, sweet crude, such as that found in the Four Corners area. <u>See</u> <u>id.</u> at 8. The supply of Four Corners crude oil has declined in recent years. <u>See</u> <u>id.</u> at 8-9. Similarly, Giant's production of gasoline has dropped by 4,216 bpd between 2000 and 2006: from 22,525 to 18,309 bpd. <u>See</u> Defendants' Hearing Exhibits, GC at 29.

134. In August 2005, Giant purchased the Texas-New Mexico pipeline running between Jal and Bisti, New Mexico. See Defendants' Hearing Exhibits, AD at 10, 23-24. By acquiring this pipeline, Giant aims to return its refineries to higher levels of production by accessing reserves of west Texas crude oils. See id. West Texas crude has a higher sulfur content, however, than that found in the Four Corners, and may not be optimal for Giant's Ciniza and Bloomfield refineries. See Hearing Transcript at 741:14-742:9 (Matthew); 877:19-878:20 (Stevens).

### 9.    Flying J.

135. Flying J, Inc., is a large, fully-integrated petroleum company. As part of its integrated petroleum business, Flying J operates a network of 220 travel plazas and fuel stops nationwide, including in northern New Mexico, and runs one of the largest trucking operations in the United States. See Defendants' Hearing Exhibits, DS (Flying J Website).

136. In 2006, Flying J purchased the Longhorn pipeline, which delivers product from the Gulf Coast to El Paso. See Defendants' Hearing Exhibits, DV (Declaration of J. Phillip Adams, executed April 26, 2007) ¶ 3, at 1; Defendants' Hearing Exhibits, DT (Press Release, dated August 17, 2006).

137. The Longhorn pipeline has a current operating capacity of 72,000 bpd. See Defendants' Hearing Exhibits, DT; Defendants' Hearing Exhibits, FR (Vic Kolenc; Longhorn Pipeline to Double Capacity, El Paso Times, dated April 24, 2007). Plans have been announced to expand the capacity of the Longhorn pipeline to 125,000 bpd by mid-2008. See Defendants' Hearing Exhibits, FR.

138. **[SEALED PORTION REMOVED]**.

139. Once this sizable volume of product shipped on Longhorn reaches El Paso, Flying

-25-

J either transfers that product to the Kinder Morgan East pipeline running to Arizona, trucks the product to its own retail outlets and other customers in El Paso, Albuquerque, Tucson, Phoenix and other locations in the Southwest, or sells the product to third parties at its Longhorn terminal, which is connected to the Longhorn pipeline, has a 1,000,000 barrel storage capacity, and is also capable of moving product from the Longhorn pipeline onto the Plains pipeline.

140.    Since it began shipping on Longhorn, Flying J has steadily increased the volume of product it trucks from Texas to New Mexico.  See Defendants' Hearing Exhibits, GC at 26-27. Records indicate that Flying J trucked 4,757 bpd of gasoline to New Mexico from Texas in the last quarter of 2006.  See id. at 19; Defendants' Hearing Exhibits, FQ (Texas Comptroller of Public Accounts, Motor Fuel Imports and Exports Detailed by State).

141.    For Flying J, the added costs of trucking product are eight cents per gallon when trucking to Albuquerque from El Paso, and ten to thirteen cents per gallon when trucking from El Paso to Phoenix or to Tucson.  Additional costs place Flying J at an economic and competitive disadvantage relative to firms transporting from and to the same locations via pipeline.  See Plaintiff's Hearing Exhibits, PX04011  (Declaration of J. Phillip Adams, executed April 26, 2007) ¶ 8, at 2.

### 10.    Other Trucking Companies.

142.    During the past eighteen months the trucking of gasoline into New Mexico has increased.  See Hearing Transcript at 947:8-11 (Kalt).  In 2006, according to export data from the state of Texas, over 22,000 bpd of gasoline were trucked from Texas into New Mexico.  See id. at 946:22-25.  The volume being trucked into New Mexico approaches the level of consumption for the greater Albuquerque area, approximately 26,000 bpd.  See Defendants' Demonstrative Exhibits,

-26-

Slide 244.  Gasoline shipments over the Plains pipeline into New Mexico amount to 12,469 bpd. See Hearing Transcript at 947:1-5 (Kalt).  The Defendants' economic expert's analysis indicates that at least 1,400 bpd of gasoline are being trucked into Albuquerque.  See id. at 947:9-948:7.  There is no evidence in the record contradicting the analysis of the Defendants' economic expert.

### 11.    Gulf Coast Refiners.

143.    *[SEALED PORTION REMOVED]*.

144.    From the Longhorn terminal in El Paso, Gulf Coast refiners are able to have gasoline trucked to northern New Mexico using common carriers, such as Flying J.  See Defendants' Hearing Exhibits, GC at 19; Defendants' Hearing Exhibits, DV ¶ 7, at 1-2.  The Defendants' economic expert, Professor Joseph P. Kalt, identified at least sixty-four firms that consistently truck gasoline from Texas to New Mexico.  See Defendants' Hearing Exhibits, GC at 40, Figure 10.

## VI.    THE TRANSACTION.

145.    On August 26, 2006 Western entered into a merger agreement with Giant, under which Western would acquire all of Giant's outstanding shares in a transaction valued at approximately $1.5 billion.  See Defendants' Hearing Exhibits, A (Agreement and Plan of Merger By and Among Western Refining, Inc. New Acquisition Corporation, and Giant Industries, Inc., August 26, 2006);  Plaintiff's Hearing Exhibits, PX00020 at 011.

146.    On November 12, 2006, the parties amended the merger agreement.  The amended agreement, among other things, provided for per share merger consideration of $77.  See Plaintiff's Hearing Exhibits, PX00020 at 011.

147.    The merger would allow Western to become vertically integrated by providing Western with gas stations and a distribution business to enter the downstream market in New Mexico

and Arizona.  <u>See</u> Hearing Transcript at 739:17-740:7; 771:14-20 (Foster).  The addition of retail outlets would provide Western a secure customer base to which to sell its refinery production.  <u>See</u> <u>id.</u> at 738:13-739:16.

148.    The merger will also give Western a terminal in Albuquerque, thereby allowing it to supply distributors at the rack.  <u>See</u> <u>id.</u> at 744:4-12; 877:12-15 (Stevens).

149.    Another key driver of the merger is Western's desire to acquire Giant's Yorktown refinery.  <u>See</u> <u>id.</u> at 739:5-16 (Foster).  Having refineries in multiple locations would allow Western to diversify its risk across multiple markets.  <u>See</u> <u>id.</u> at 736:21-737:14.  A single catastrophic event could shut down Western's El Paso operations.  <u>See</u> <u>id.</u>

150.    Western has consistently operated its refinery at or near capacity.  <u>See</u> <u>id.</u> at 736:7-14. The merger would allow Western to apply its operational expertise to greater volumes, and perhaps increase the efficiency of Giant's refineries.  <u>See</u> <u>id.</u> at 736:7-20; 738:12-739:16.

151.    Western has a long-term supply contract for the unique blend of super sweet crude that the Giant refineries utilize.  <u>See</u> <u>id.</u> at 743:3-21.  Western believes that Giant's source of sweet crude supply is not the best source for Giant's refinery.  <u>See</u> <u>id.</u> at 741:14-20.  Because Giant's continued ability to secure a stable supply of sweet-crude is uncertain, the proposed  merger would better ensure that Giant's Four Corners refineries will have long-term access to the crude oil they need.  <u>See</u> <u>id.</u> at 741:21-742:9.

**VII.    <u>NATURE OF THIS ACTION.</u>**

152.    On April 10, 2007, the FTC authorized the commencement of an action under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which its staff filed on April 12, 2007, to seek a temporary restraining order and preliminary injunction barring the Western/Giant merger during the pendency

of an administrative proceeding.  <u>See</u> Complaint ¶ 9, at 4.

153.    On April 13, 2007, the Court issued a Memorandum Opinion and Order granting the FTC's application for a temporary restraining order.  <u>See</u> Memorandum Opinion and Order, filed April 13, 2007 (Doc. 37).

154.    The FTC seeks a preliminary injunction under Section 13(b) prohibiting the proposed merger of Western and Giant pending an administrative trial on the merits.  <u>See</u> Complaint at 1-2. Specifically, the FTC requests a preliminary injunction enjoining any acquisition, directly or indirectly, of stock or assets of, or other interest in, Giant by Foster and Western's domestic and foreign agents, divisions, subsidiaries, affiliates, partnerships, and joint ventures, pending the resolution of an administrative complaint by the FTC challenging such acquisition and until such complaint is dismissed by it or set aside by a court on review, or until the order of the FTC to cease and desist therein has become final.  <u>See</u> <u>id.</u>

155.    The closing of the merger is subject only to the Court's granting of the preliminary injunction the FTC has requested.

## VIII.    <u>RELEVANT PRODUCT MARKET IS BULK SUPPLY OF GASOLINE.</u>

156.    The FTC alleges that the relevant product market for assessing the competitive effects of the merger is the bulk supply of light petroleum products. <u>See</u> Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act ¶ 35(a), at 11, filed April 12, 2007 (Doc. 4)("Amended Complaint").

157.    The FTC has properly defined the relevant product market.

158.    The Defendants have stipulated that the bulk supply of gasoline is a properly defined antitrust product market.  <u>See</u> Appendix to Plaintiff's Memorandum of Points and Authorities in

-29-

Support of its Motion for Leave to File First Amended Complaint ¶ 34(a), at 11, filed April 26, 2007

(Doc. 131).

159.    The bulk supply of gasoline is an appropriate product market to assess the competitive

effects of the merger.

## IX.    <u>RELEVANT GEOGRAPHIC MARKET</u>.

### A.    THE FTC HAS NOT PROPERLY DEFINED A RELEVANT GEOGRAPHIC MARKET.

160.    The FTC's geographic market is inadequate.  Under the <u>Merger Guidelines</u>:

> In defining the geographic market or markets affected by a merger, the Agency will
> begin with the location of each merging firm (or each plant of a multiplant firm) and
> ask what would happen if a hypothetical monopolist of the relevant product at that
> point imposed at least a "small but significant and nontransitory" increase in price,
> but the terms of sale at all other locations remained constant.  If, in response to the
> price increase, the reduction in sales of the product at that location would be large
> enough that a hypothetical monopolist producing or selling the relevant product at
> the merging firm's location would not find it profitable to impose such an increase
> in price, then the Agency will add the location from which production is the next-best
> substitute for production at the merging firm's location.

Defendants' Hearing Exhibits, CG (U.S. Dep't of Justice & FTC, <u>Horizontal Merger Guidelines</u>

(1997)) § 1.21, at 8 ("<u>Merger Guidelines</u>").

161.    Neither Western's nor Giant's refineries are located within the FTC's alleged relevant

geographic market.  There are no crude oil refineries physically located in the alleged northern New

Mexico relevant geographic market.  <u>See</u> Defendants' Demonstrative Exhibits, 32.  None of the

firms that the FTC identifies as market participants operate refineries within northern New Mexico.

<u>See</u> Defendants' Hearing Exhibits, BA at 7-8; Defendants' Hearing Exhibits, EQ at 23; Defendants'

Hearing Exhibits, BQ at 61;  Defendants' Hearing Exhibits, AD at 1; Defendants' Hearing Exhibits,

I at 23-24; Defendants' Hearing Exhibits, AP at 5, 24.

162.    In its complaint, the FTC alleges that the relevant geographic market for assessing the competitive effect of this merger is "northern New Mexico."  See Amended Complaint ¶35(a), at 11.  The FTC defines northern New Mexico as encompassing the following counties: Rio Arriba, Taos, Los Alamos, Sandoval, Santa Fe, Mora, San Miguel, Bernalillo, Valencia, Torrance, and Guadalupe.  See id. ¶ 35(b), at 12.  The FTC's alleged relevant geographic market terminates abruptly at New Mexico's Colorado border and excludes adjacent counties within northwestern New Mexico, such as San Juan, McKinley, and Cibola counties.  See id.

163.    The FTC's economic expert did not endorse the relevant geographic market alleged in the FTC's Complaint.  Instead, he defined a different geographic market:  the Albuquerque MSA, which encompasses four counties.

164.    The  FTC's industry expert also did not endorse the relevant geographic market alleged in the FTC's complaint.  Instead, he defined a market of "northern New Mexico, specifically the counties served from Giant's refineries and pipeline-supplied Albuquerque area terminals." Plaintiff's Hearing Exhibits, PX04061 ¶ 6, at 4.  This relevant geographic market entails at least nineteen counties.  See Defendants' Hearing Exhibits, GC ¶ 2, at 13.

165.    No witness explained why the borders of either the FTC's relevant geographic market or the experts' markets were appropriate.

166.    Customers in the northern New Mexico market purchase gasoline from supply sources not included in the FTC's relevant geographic market.  For example, a customer witness for the FTC testified that he trucks gasoline from Amarillo to serve customers in San Miguel and Guadalupe counties.  See Hearing Transcript at 366:24-367:15 (Conway).

167.    Other wholesale companies also supply gasoline to portions of northern New Mexico

by transporting it from Amarillo, which is outside of the FTC's alleged geographic market.  See id. at 366:16-367:19.

168.    Approximately1,400 bpd of gasoline are trucked to Albuquerque.  See id. at 948:6-7 (Kalt).

169.    **_[SEALED PORTION REMOVED]_**.

170.    Gasoline is trucked into the FTC's relevant market from supply sources outside the FTC's geographic market; gasoline is also trucked from within the FTC's relevant market to neighboring geographic areas.  Jobbers pick up gasoline in Albuquerque and truck it to other locations, such as Arizona.  See id. at 367:20-367:25 (Conway).  As supply has tightened in Arizona and prices relative to Albuquerque have risen, trucking from Albuquerque to Arizona has increased. See id. at 368:1-369:9.

171.    Similarly, ConocoPhillips supplies branded retail outlets around New Mexico from its Albuquerque terminal.  See id. at 406:1-407:15 (Morrison). Many of ConocoPhillips' retail outlets are located outside the FTC's relevant geographic market.  See id.; Defendants' Hearing Exhibits, GI (Conoco Retail Location Map).

**B.    UNIVERSE OF SUPPLIERS.**

172.    The relevant product market includes Western as a competitor.

173.    The Defendants contend that, pursuant to the FTC's position in its last litigated Clayton Act, Section 7, preliminary injunction matter, FTC v. Aloha Petroleum, No. CV 05-00471 (D. Haw. 2005)("Aloha Petroleum"), Western should not be included as Giant's competitor, because Western neither owns nor has long-term access to a terminal in northern New Mexico.  See Defendants' Hearing Exhibits, GC at 11-12.

-32-

174.    In <u>Aloha Petroleum</u>, the FTC asserted a narrow bulk supply market that included only local indigenous refiners, terminal operators, and firms with long-term contractual access to terminals.  The FTC represented to the United States District Court for the District of Hawaii that access to a local product terminal was indispensable to bulk supply competition.  "[O]wnership of a [local] refinery or ownership of, or unfettered access to, a terminal on Oahu is necessary to make a bulk sale of gasoline."  Defendants' Hearing Exhibits, CK (Petroleum: Plaintiffs' <u>Aloha</u> Proposed Findings of Fact)  ¶ 21, at 11.  "[A] 'bulk-supplier' of gasoline . . . has the ability to refine or import gasoline and the ability to store, market, and distribute large quantities of the product."  Defendants' Hearing Exhibits, CL (Declaration of John B. Hayes, Ph.D.) ¶ 9, at 3.  "Bulk-supplied gasoline is virtually always distributed through a petroleum terminal.  There are no practical alternatives to distributing bulk-supplied gasoline through a petroleum terminal."  <u>See</u> <u>id.</u> ¶ 18, at 5.  "Bulk suppliers include refiners and owners or operators of gasoline terminals."  <u>See</u> Defendants' Hearing Exhibits, CJ (<u>Aloha Petroleum</u>, Complaint for Temporary Restraining Order and Preliminary Injunction Pursuant to Section 13(b) of the Federal Trade Commission Act) ¶17, at 6.

175.    The FTC noted the significance of terminal access in defining geographic markets in its August 2004 Petroleum Merger Study: "Whether more distant refineries should be included in the market depends on a variety of factors. . . .  Capacity or access limitations at the bulk transportation or terminal levels are also relevant."  <u>See</u> Defendants' Hearing Exhibits, CM at 23.

176.    The Defendants contend that, because Western has neither a terminal nor terminal access in northern New Mexico, under the correct definition of the relevant market -- as the FTC advanced in <u>Aloha Petroleum</u> -- Western is not currently a market participant.  The Defendants contend that, rather than eliminating a competitor, the transaction would merely replace Giant with

-33-

the merged entity as one of the many suppliers already available to bulk gasoline customers in northern New Mexico.  Thus, there would be no change in market concentration, and the merger would have no competitive effect.  <u>See</u> Defendants' Hearing Exhibits, GC at Figure 1.

177.    Because Western can deliver product to its customers at the customers' terminals in Albuquerque; to some degree, it cannot use their terminals or terminal racks to sell to third parties. <u>See</u> Hearing Transcript at 744:4-12 (Foster).  Selling at the rack "gets you access to a whole different level of customer than a customer that you would sell a pipeline shipment to."  <u>Id.</u> at 876:23-877:4 (Stevens).  The FTC has not provided the Court evidence of an instance in which Western has sold product from one of its customer's terminals in Albuquerque to a third party.

178.    Without its own terminal in Albuquerque, Western can only deliver gasoline over the Plains pipeline with the consent of its existing customers.  ***[SEALED PORTION REMOVED]***.

179.    Occasionally Giant will let Western use its terminal on a short-term basis, but Western does not have long-term access to a terminal in Albuquerque.  <u>See</u> Hearing Transcript at 744:4-12 (Foster).

180.    Western's efforts to gain long-term access to Chevron's terminal in Albuquerque have been rejected.  ***[SEALED PORTION REMOVED]***.

181.    The FTC's position has not been entirely consistent in this case or entirely consistent with positions it has taken in other cases.  The FTC noted in this case: "[A] company that needs the cooperation of another supplier in the market cannot be considered to be an effective competitor within the market."  <u>Id.</u> at 36:12-14 (Lang).  In response to the FTC's position, the Defendants argue that, because it lacks terminal access, "Western's presence in the Albuquerque market . . . is entirely at the convenience of their customers," upon whom Western depends for terminal access.  <u>Id.</u> at

-34-

276:20-23 (Ownby).  See id. at 744:22-745:5 (Foster).  *[SEALED PORTION REMOVED]*.

### C.   THE FTC HAS ESTABLISHED COMPETITION BETWEEN WESTERN AND GIANT IN NORTHERN NEW MEXICO AND, SPECIFICALLY, IN THE ALBUQUERQUE AREA.

182.   Giant and Western are competitors.

183.   Western supplies northern New Mexico through the Plains pipeline, which is fed solely by Western's refinery in El Paso and Holly's El Paso terminal.  *[SEALED PORTION REMOVED]*.  See Plaintiff's Hearing Exhibits, PX04000 ¶¶ 7, 15, at 3, 6; Plaintiff's Hearing Exhibits, PX00022 at 024.

184.   The Western-supplied gasoline includes both volumes that Western ships in its own name to customers in Albuquerque and volumes Chevron and Giant, who purchase gasoline from Western in El Paso at Albuquerque-based prices and ship it, own.  See  Plaintiff's Hearing Exhibits, PX04061 ¶ 22, at 11;  Plaintiff's Hearing Exhibits, PX04009 (Declaration of James E. Conway, Jr., executed April 6, 2007) ¶ 7, at 1-2.

185.   The core markets for Western are Arizona, New Mexico, and Texas -- or West Texas, and probably northern New Mexico.  See Plaintiff's Hearing Exhibits, PX03565 (Declaration of Paul L. Foster, taken April 2, 2007) at 011 (40:22-24).

186.   *[SEALED PORTION REMOVED]*.

187.   *[SEALED PORTION REMOVED]*.

188.   According to the FTC, relevant product markets in petroleum mergers have generally been based on one or more of the following crude oil transformation stages:  (i) exploration and production of crude oil; (ii) bulk transportation of crude oil; (iii) bulk supply (refining and bulk transportation) of refined products; (iv) terminaling of refined products; and (v) marketing

(wholesale and retailing) of refined products.   See Plaintiff's Hearing Exhibits, PX04053 (Bureau of Economics, The Petroleum Industry:  Mergers, Structural Change, and Antitrust Enforcement) at 005.

189.     All gasoline shipped on the Plains pipeline is delivered to Albuquerque or Belen and is therefore part of the northern New Mexico market.  See Plaintiff's Hearing Exhibits, PX04008 (Declaration of Rocky Elgie, executed March 23, 2007) ¶¶ 6, 12, at 1-2; Plaintiff's Hearing Exhibits, PX04000 ¶ 7, at 3.

190.     The Plains pipeline is full.  Nevertheless should northern New Mexico gasoline prices increase, new shippers can gain space in a meaningful way, although each new shipper would be limited to 1.25 percent.  See Plaintiff's Hearing Exhibits, PX01200 at 037;  Plaintiff's Hearing Exhibits, PX04061  ¶¶ 25-26, 45, at 13, 22.  Current shippers could also respond by shifting some supply from diesel to gasoline.  See Plaintiff's Hearing Exhibits, PX04000 ¶ 11, at 4-5.

191.     Western has delivered approximately 2,300 to 2,500 bpd to Albuquerque for the last fourteen years.  See Hearing Transcript at 758:5-10 (Foster).

192.     Terminal access does not significantly constrain bulk supply in Albuquerque.

193.     While Western does not own a terminal in Albuquerque, Western has and does currently deliver product to one or more terminals in Albuquerque.  See id. at 758:2-759:9.

194.     Competition between Giant and Western is attenuated.  Western and Giant compete for bulk petroleum supply in El Paso.  See id. at 744:13-21; 943:1-14 (Kalt)( "Giant has terminals -- it's serving the northern New Mexico market from those terminals as a seller of bulk supply -- but Western does not.").  Giant secures El Paso product through an exchange agreement with Chevron. See id. at 744:13-20 (Foster).

-36-

195.     The FTC has not provided evidence  that Western and Giant compete in the relevant market. There is evidence that Western is Giant's supplier. Giant and Phoenix Fuel are Western's customers.  See id. at 738:13-20; 832:11-19 (Matthew).  Giant currently purchases 125,000 to 140,000 barrels of gasoline per month from Western.  See id. at 845:3-9 (Matthew).  Giant supplies Shell in Albuquerque by purchasing gasoline from Western.  See id. at  842:4-7.  Giant's subsidiary, Phoenix Fuel, is one of Western's two largest customers.  See id. at 738:13-20; 763:9-16 (Foster).

196.     Giant operates wholesale and retail gasoline businesses; Western does not participate in these markets.  See id. at 770:24-771:20.  Giant  represents that it "[does not] compete against [Western] in its marketplace."  See id. at 833:7-13 (Matthew).

197.     Giant does not see Western as a competitor in Albuquerque for branded jobber business.  See id. at 835:17-19.  Giant's branded jobber business accounts for twenty percent of its gasoline sales.  See id. at 835:20-22.  The FTC's jobber witness testified that he was unaware of any jobber in Albuquerque buying from Western.  See id. at  362:3-15 (Conway). ***[SEALED PORTION REMOVED]***.

198.     Giant also does not see Western as a competitor in Albuquerque for unbranded jobber, distributor, hypermart, or unbranded grocery store business.  See id. at 837:22-838:6 (Matthew).  That business category accounts for twenty-five percent of Giant's sales.  See id. at 838:2-3. Jobbers in Albuquerque do not see Western as a competing supplier.  For example, Petro Stopping Centers "does not currently view Western as a viable source of supply for its travel center near Albuquerque."  Defendants' Hearing Exhibits, CE (Declaration of Jim Cardwell, dated March 9, 2007) ¶ 3, at 1.  Petro's president explained that he is "not aware that Western has any terminal access in the Albuquerque area to make such product available."  Id. ¶ 8, at 2.  Petro did, however,

identify other firms with terminal access as Petro's current viable bulk supply alternatives.  See id. ¶¶ 4-8, at 2; Defendants' Hearing Exhibits, CC (Declaration of Alan Wright, dated  March 21, 2007) ¶¶ 7-11, at 2.  Pilot Travel Centers, LLC does not consider Western to be a source of supply in Albuquerque.  Similarly, Polk Oil Company, which operates retail gasoline stations and convenience stores in Albuquerque and other New Mexico municipalities, purchases "almost all of its product in Albuquerque" at terminals, and "uses its own trucks to transport the product to its retail stations," did not identify Western as being among the actual or potential sources of product supply for its New Mexico retail stations.  Defendants' Hearing Exhibits, CD (Declaration of Jim Polk, dated March 23, 2007) ¶¶ 3-5, 7, 10-11, at 1.

**D.    GIANT AND WESTERN COMPETE WITH OTHERS TO SUPPLY BULK QUANTITIES OF GASOLINE TO NORTHERN NEW MEXICO.**

199.    When the Defendants address and analyze their competition in ordinary course-of-business documents, they focus primarily on each other and other gasoline bulk suppliers to northern New Mexico.  See Plaintiff's Hearing Exhibits, PX00023 (Syndicated Loan Capital Markets) at 062. Western confirmed that Giant's Four Corners refineries compete with shippers on pipelines originating in El Paso, Amarillo, and southeastern New Mexico.  See id.

200.    Giant and Western compete with ConocoPhillips, Valero, Holly, Chevron, and Shell in supplying bulk quantities of gasoline to northern New Mexico.

**E.    THE FTC EXCLUDES FROM ITS RELEVANT MARKET SIGNIFICANT SUPPLIERS WHO CURRENTLY SERVE, OR COULD POTENTIALLY SERVE, NORTHERN NEW MEXICO.**

**1.    Alon.**

201.    The FTC's economic expert, Professor Halbert White, alleges that the proposed

-38-

merger would reduce competition in the bulk supply of gasoline to northern New Mexico by reducing the number of competitors in the relevant market from seven to six.  See Plaintiff's Hearing Exhibits, PX04063 at 013.  *[SEALED PORTION REMOVED]*.

202.    Professor White does not offer sufficient justification for excluding Alon from the relevant market.  Gasoline bulk supply purchasers -- retailers and jobbers -- make no economically meaningful distinction between product brought to the market via an exchange contract, and product brought to the market via a purchase and sale contract.  *[SEALED PORTION REMOVED]*.  Alon thus stands ready to compete as a seller of bulk gasoline in the market in a like manner as, for example, Chevron.  See Defendants' Hearing Exhibits, GC at 14.

203.    *[SEALED PORTION REMOVED]*.

204.    Alon has also supplied its Albuquerque customers with product shipped from the Gulf Coast to El Paso on the Orion/Magellan pipeline.  See Hearing Transcript at 881:22-882:11 (Stevens).  In late 2004, Alon found itself facing a substantial product shortfall in Albuquerque.  See id.  Alon approached Western seeking to purchase the additional volumes it required.  See id. Western responded by obtaining product in the Gulf Coast, shipping the gasoline over the Orion/Magellan pipeline, and delivering it to Alon in El Paso.  See id.  Alon then shipped the product on Plains to Albuquerque using other parties' line space. See id.

205.    Finally, Alon could seek to become a new shipper on the Plains pipeline if it so desired.  Refiners without line time on Plains can take advantage of Plains' new shipper policy.  See Defendants' Hearing Exhibits, BY (Plains Pipeline, L.P.,  Rules and Regulations) Rule 160 § 2.5, at 6.  *[SEALED PORTION REMOVED]*.

2.      **Other Alternate Supply Sources Available to Plains Shippers.**

206.     Pipeline space constrains bulk supply into Albuquerque.

207.     Although the Plains pipeline is full, refiners besides Western and Giant -- such as Chevron, Shell, and Holly -- have their own line time on the Plains pipeline.  See Defendants' Hearing Exhibits, GC at 39.  Thus, Western alone does not control northern New Mexico's gasoline supply.

208.     ***[SEALED PORTION REMOVED]***.

209.     ***[SEALED PORTION REMOVED]***.

210.     Western has turned to the Gulf Coast refiners to meet its gasoline needs in El Paso. Western brings about 25,000 barrels up the Orion/Magellan line to El Paso from the Gulf Coast every day.  See id. 747:1-12 (Foster).  Some of this Gulf Coast gasoline has been used to supply Albuquerque.  See id.  For example, Western has sourced Gulf Coast supply to Alon, which took product in El Paso and delivered it to Albuquerque.  See id. at  881:22-882:11 (Stevens).  The same is true for Valero, for which Western also brought barrels up the Magellan/Orion pipeline from the Gulf Coast.  See id. at 874:9-875:3.

211.     Albuquerque bulk suppliers thus can either ship from the Gulf Coast directly themselves, or can rely on Flying J, which is shipping 25,000 bpd on the Longhorn pipeline to El Paso.  Under a realistic economic analysis, a refiner that can sell to Flying J or that has direct access to El Paso must be treated as a plausible source of supply.  See id. at 952:25-955:7; 1025:21-1026:7; 1027:2-7 (Kalt).  ***[SEALED PORTION REMOVED]***.

212.     ***[SEALED PORTION REMOVED]***.  For this reason, Western executives view Gulf Coast refiners as competitors for northern New Mexico customers.  See Hearing Transcript at

876:16-17 (Stevens).

213.    *[SEALED PORTION REMOVED]*.  Thus, new shippers could co-opt up to 1,400 bpd on the Plains line from El Paso to Albuquerque.  <u>See</u> Defendants' Hearing Exhibits, GC at 40; Defendants' Hearing Exhibits, BY, Rule 160 § 2.5, at 6.  *[SEALED PORTION REMOVED]*.

214.    It is not particularly difficult to obtain new shipper status on the Plains pipeline.  Shell obtained new shipper status on Plains and now enjoys pro-rationing rights on the pipeline, shipping product to Albuquerque on its own line time.  <u>See</u> Hearing Transcript at 824:14-825:3 (Ericksen).

### 3.    <u>Trucking from Texas into Northern New Mexico.</u>

215.    Common carriers -- including Flying J -- trucking from Longhorn's El Paso terminal to Albuquerque provide another alternative source of supply.  The "evidence continues to grow, that, in fact, [Flying J's trucking] is quite consistent, routine, and [of] substantial volume."  <u>Id.</u> at 944:5-12 (Kalt).  Professor White acknowledged that "more than 1,000 bpd of gasoline from sources other than Giant could be trucked into Albuquerque."  <u>Id.</u> at 667:19-22 (White).  That volume exceeds the amount of Professor White's hypothetical future Giant supply expansion.  <u>See id.</u> at 668:10-12.

216.    Giant's  Albuquerque terminal has a direct connection to the Plains pipeline from which it can receive the bulk supply from the pipeline.  <u>See</u> Plaintiff's Hearing Exhibits, PX04000 ¶ 7, at 3.  Giant's terminal also receives products from its refineries via truck.  <u>See</u> Plaintiff's Hearing Exhibits, PX04061 ¶ 17, at 8-9.

217.    The volume of trucking into New Mexico has been rising over time.  <u>See</u> Hearing Transcript at 947:6-10 (Kalt).  Professor Kalt's analysis of trucking data indicates that at least 1,400 bpd of gasoline is regularly trucked into Albuquerque.  <u>See id.</u> at 947:19-25; 948:1-16.

218.    *[SEALED PORTION REMOVED]*.  Albuquerque is approximately 265 miles from

-41-

El Paso.

219.   Significantly, the existing and potential flow of trucked Gulf Coast product off the Longhorn pipeline in El Paso provides an alternate supply option to Albuquerque bulk supply customers.  See id. at 948:17-24 (Kalt).  That shipments currently are trucked to northern New Mexico from El Paso suggests that trucking must be included as a supply source in the relevant market.  See id. at 952:8-17.

220.   Professor White did not ask the FTC for data on trucking from Texas or trucking by Flying J; nor did the FTC provide him with that data.  See id. at 668:13-20 (White).

**4.      Effect of Alternative Supply Sources on Price Negotiations.**

221.   The prospect of Gulf Coast suppliers servicing northern New Mexico has affected price negotiations for gasoline in northern New Mexico.  Some contracts and other long-term sales arrangements in Albuquerque include options for the buyer to elect Gulf Coast-based pricing, rather than prices based on Albuquerque or El Paso pricing.  ***[SEALED PORTION REMOVED].***

222.   The use of Gulf Coast pricing in northern New Mexico supply contracts reflects the competitive significance of Gulf Coast supplies, and is evidence that Gulf Coast refineries should be included in the relevant market.  See Defendants' Hearing Exhibits, GC at 21.

223.   ***[SEALED PORTION REMOVED].***

224.   ***[SEALED PORTION REMOVED].***

225.   As Flying J has expanded Longhorn's operation and trucked more extensively, Western has been forced to offer Gulf Coast spot prices in El Paso.  See id. at 760:23-761:6 (Foster).

**X.     ENTRY INTO THE MARKET.**

226.   The Defendants' principal defense is that new entry or expansion by existing firms

will replace Giant, and deter or counteract any anti-competitive conduct by Western.  The <u>Merger Guidelines</u> require that entry must be timely, likely, and sufficient.  <u>See</u> Defendants' Hearing Exhibits, CG at § 3.0.  In other words, the entrant must be able to "cause prices to fall to their pre-merger levels or lower." <u>Id.</u>

227.    Northern New Mexico is not as isolated a market as the FTC suggests.  Local refiners and pipelines import product from around the Southwest.

228.    Northern New Mexico is not generally inaccessible for shippers other than current suppliers.  <u>See</u> Plaintiff's Hearing Exhibits, PX00041 at 021; Plaintiff's Hearing Exhibits, PX04061 ¶16, at 7.

229.    The Defendants' business records and the testimony presented in this case confirm that barriers to entering the northern New Mexico market do not place other firms at a significant competitive disadvantage.  <u>See</u> Plaintiff's Proposed Findings at 61-66.

230.    Entry into the relevant market is relatively easy.  There are barriers to entry, but they are neither numerous nor significant.  <u>See</u> <u>id.</u>

231.    Pipelines and water-borne vessels are the most efficient and lowest cost transportation methods for supplying bulk quantities of petroleum products.  <u>See</u> Plaintiff's Hearing Exhibits, PX04061 ¶ 13, at 6-7; Plaintiff's Hearing Exhibits, PX00016 at 120.

232.    When used over long distances, it is time consuming and relatively inefficient to transport via truck.  Common carriers are limited, and drivers, who are in short supply, need to take significant breaks during the long trip from Texas.  <u>See</u> Plaintiff's Hearing Exhibits, PX04009 ¶ 14, at 3.

233.    It is more economical to transport light petroleum products over  long distances via

pipeline than tanker truck. See Plaintiff's Hearing Exhibits, PX04011 ¶ 8, at 2; Defendants' Hearing Exhibits, CE at 2.

234.    In the time it would take a wholesaler to truck from Amarillo to Albuquerque, about four to six loads could be delivered via truck from the Albuquerque terminal to the local area.  See Hearing Transcript at 454:5-8 (Reid).

235.    Assuming a wholesaler typically pays one cent to truck product from a terminal in Albuquerque to a local retail store and the trucking freight from Amarillo is ten cents, trucking from Albuquerque would cost a wholesaler nine cents per gallon more than buying the product in Albuquerque.  See id. at 452:19-453:1.

236.    From El Paso to Albuquerque it costs approximately eight cents more to truck product than to deliver it by pipeline. See Plaintiff's Hearing Exhibits, PX04011 ¶ 8, at 2.

237.    It may be more efficient to truck light petroleum products directly to retail outlets, rather than delivering them to product terminals.

238.    Despite the added cost of transporting product via truck from El Paso, trucking is a viable method for transporting light petroleum products.  See Plaintiff's Hearing Exhibits, PX04061 ¶ 14, at 7; Defendants Hearing Exhibits, CE ¶ 9, at 2.

## XI.    EFFECT OF MERGER ON PRICE.

239.    By acquiring Giant's New Mexico refining, terminaling, and marketing assets, Western will not be eliminating an important restraint on its ability to raise prices and increase margins.  Other firms can replace the competitive void -- if any -- left by Giant's elimination. Western's position in relatively concentrated markets does not significantly increase the likelihood that Western has achieved, or will be able to exercise, market power, either in coordination with

other firms or unilaterally.

240.     Northern New Mexico is a relatively illiquid market in the very short-term, is at the end of supply pipelines, and relatively few suppliers serve it. All have disincentives to maintain free stocks of gasoline in Albuquerque-area terminals. See Plaintiff's Proposed Findings at 35-37.

241.     Giant's new crude oil pipeline is almost operational and will result in expanded gasoline production at its Four Corners refineries. Over 8,000 barrels of additional gasoline will be produced daily at the two refineries, resulting in over 125 million gallons of additional gasoline supply annually. See id. at 38-46.

242.     The FTC has convinced the Court that Giant, but for the merger, plans to deliver approximately 1,400 bpd, or over 20 million gallons annually, of this incremental gasoline supply to northern New Mexico. See id. The FTC has not convinced the Court, however, that it will be able, or will even desire, to increase its total volume of gasoline shipments to Albuquerque.

243.     The FTC has not convinced the Court that Giant's crude supply-induced production expansion will result in an approximate ten cent per gallon decline in Albuquerque area gasoline prices. See id.

244.     Giant's increased northern New Mexico gasoline supply may benefit New Mexico consumers, but it is not possible to say that it will, as the FTC argues, directly affect the bottom line of all current bulk gasoline suppliers, especially Western. With the proposed merger, Western will control Giant's incremental gasoline supply and be able to divert it away from Albuquerque-area terminals and the customers those terminals serve. This diversion could, if it occurred, eliminate the anticipated competitive benefits of Giant's increased Albuquerque supply, raising prices at least back to where they are today. See id. at 29-61. There are a number of reasons to believe, however, that

-45-

the incremental increase in Giant shipments to Albuquerque will not dramatically decrease Albuquerque prices; that any diversion will not occur; and that, if it occurs, it will not result in the significant price increases that the FTC projects.

###   A.    THE DEFENDANTS HAVE REBUTTED ANY PRESUMPTION OF ANTI-COMPETITIVE EFFECTS BY SHOWING EASE OF ENTRY.

245.    The FTC has demonstrated sufficiently high market shares and increases in market concentration to trigger the presumption that the Western/Giant merger will likely have anti-competitive effects.  The Defendants have, however, rebutted this presumption with proof of ease of entry, cognizable efficiencies, or other recognized defenses.

246.    Consumer demand for gasoline is "highly-price inelastic," which means if the price of gasoline rises, consumers will not turn to alternative products.  See Plaintiff's Hearing Exhibits, PX04063 ¶ 29, at 011.

247.    The effect of the merger will not likely be to increase prices.  Entry is likely if prices move up, and withdrawal is likely if prices move down.  See Plaintiff's Proposed Findings 61-66.

248.    The absence of easy demand-side substitution between gasoline and other refined products tends to make a small but significant non-transitory price increase profitable.  See Plaintiff's Hearing Exhibits, PX04063 ¶ 25, at 10.

249.    The FTC asserts that the status quo is the price that gasoline will be in northern New Mexico after Giant's Jal pipeline comes on line.  The Court is not convinced, however, that this small amount of additional gasoline will result in the price decrease that the FTC predicts or projects.  Any price decrease associated with the Jal pipeline is certainly not in place now and therefore should not  be considered the current "status quo."

250.     The proposed acquisition will not sharply decrease the incentives of the combined Western/Giant to bring new wholesale gasoline supply from the Giant refineries to northern New Mexico.  The Court is not convinced the proposed merger will likely result in millions of dollars of increased wholesale and retail gasoline prices in the area.  See Plaintiff's Proposed Findings at 29-61.

**B.      BULK SUPPLY TRANSPORTED BY TRUCK IS A SUFFICIENT ALTERNATIVE TO CONSTRAIN THE MERGING DEFENDANTS.**

251.     Traveling costs constrain bulk supply into Albuquerque.

252.     The economic viability of trucking light petroleum products bulk supply into Albuquerque, however, depends on several factors.

253.     These factors include the price of bulk supply gasoline within the relevant area rising high enough for customers to substitute bulk supply delivered directly from refineries or via pipeline for bulk supply delivered via tanker truck from distant sources, such as El Paso.  See Plaintiff's Hearing Exhibits, PX04063 ¶ 35, at 9; Plaintiff's Hearing Exhibits, PX04061 ¶ 14, at 7.

254.     Pipeline and truck supplied gasoline from local refineries are substitutes, because pipelines and local refineries can provide bulk quantities of product at relatively comparable costs.  See Plaintiff's Hearing Exhibits, PX04061 ¶ 16, at 7.

**XII.    UNILATERAL EFFECTS.**

255.     The merger will not dramatically increase concentration in the relevant market.

**A.      MARKET CONCENTRATION YIELDS A PRIMA FACIE CASE.**

256.     As explained in the Merger Guidelines, the effect on concentration in any market is the logical economic "starting point" for merger analysis.  Defendants' Hearing Exhibits, CG at §

2.0.   "Mergers that either do not significantly increase concentration or do not result in a concentrated market ordinarily require no further analysis." Id. at § 1.0.  While the merger increases concentration in an already concentrated market, the Giant-Western merger would not significantly increase concentration under any reasonable standard.

257.    The Herfindahl-Hirshman Index ("HHI") is a measure of market concentration used to assess the effects of a merger.   It is calculated by summing the squares of the individual market shares of all market participants, and then measuring the change pre- and post-merger.  See Defendants' Hearing Exhibits, CG at § 1.5.

258.    Markets are not considered "highly" concentrated unless the HHI is over 1,800, and, even in highly concentrated markets post-merger, mergers producing an increase in the HHI of less than 50 points are unlikely to have adverse competitive consequences and ordinarily require no further analysis. See id. at § 1.51.

259.    Professor White generated a concentration analysis, but that analysis improperly excludes Alon, Gulf Coast refiners, and volumes that trucks deliver to northern New Mexico.  See Plaintiff's Hearing Exhibits, PX04063 at 013.  Gulf Coast refineries already compete to supply northern New Mexico.  Gasoline from Gulf Coast refiners is already transported in substantial quantities to El Paso.  Western moves much of this gasoline into the Albuquerque area through the Plains pipeline.  Flying J, which is moving gasoline to El Paso from Gulf Coast refineries through the Longhorn pipeline, trucks gasoline to the Albuquerque area from its El Paso terminal.  Further, with a small but significant price increase, it is almost always profitable to ship gasoline from the Gulf Coast to Albuquerque.  See Hearing Transcript at  955:8-20 (Kalt).  Alon also belongs in the analysis, because it has headroom under its exchange agreement with Holly and could supply more

gasoline to Albuquerque by giving Holly more gasoline in El Paso.  See id. at 988:15-989:5.

260.    Professor Kalt also analyzed the terminal access market following the FTC's "Aloha Petroleum methodology" and found no change in concentration.  See id. at 943:18-945:4.  Further, there is no terminal overlap between Western and Giant.  See id. at 943:1-14.

261.    In an analysis of the ability to supply, a firm's potential future shipments after a small but significant increase in price are relevant, as are its actual shipments.  See id. at 1027:5-12.  The standard economic approach treats each seller from which buyers can shop as equal to the other sellers from whom a buyer can purchase.  See id. at 952:5-953:5; 1027:20-1028:1; Defendants' Demonstrative Exhibits, Slide 45.  Firms like Flying J or Chevron have access to the Gulf Coast through the Longhorn pipeline and the Longhorn pipeline is shipping gasoline into El Paso today.

262.    One must consider the future ability of customers to turn to Gulf Coast suppliers if prices were to rise post-merger.  Gulf Coast supply would be an effective constraining force on prices in Albuquerque post-acquisition.  Flying J, which is trucking Gulf Coast sourced gasoline to Albuquerque, could do more of the same.  It is already constraining prices in Albuquerque according to Holly.  See Hearing Transcript at 507:3-6; 508:21-23 (White); Defendants' Hearing Exhibits, BA at 12.  *[SEALED PORTION REMOVED].*  There is no reason why Chevron could not similarly constrain the price at which Western sells to it for Albuquerque delivery.

263.    With the inclusion of the various firms who do or could supply Albuquerque after a small but significant price increase, the post-merger combined market share of  Western and Giant is 5.7 percent, which corresponds with a change in HHI of only fifteen.  See id. at 959:19-22; 960:14-20 (Kalt); Defendants' Demonstrative Exhibits, Slide 45.

264.    While a change of fifteen would not be significant, the Court does not  believe that

it should include all the Gulf Coast refiners, because the record does not establish that all refiners are actually or currently sending product to the relevant market. The potential is there, but the market remains concentrated. Both parties' experts admitted the market is concentrated, but it appears that most such markets are similarly concentrated. Thus, the Court will find that the FTC has made a prima facie case under the Merger Guidelines, but it is a weak prima facie case.

265.   Trucking from Texas may also be moving product into the Albuquerque area from locations outside of the Gulf Coast. This trucking was not included in the Defendants' economic expert's concentration analysis and, if it had been,  a lower combined share would have resulted. See Hearing Transcript at 944:5-12 (Kalt).

266.   Professor White's assessment shows a higher combined market share than Professor Kalt's.  See Plaintiff's Hearing Exhibits, PX04063 at 13.  Professor White's share is based on shipments to Albuquerque.  Professor White attributes a market share to a supplier who ships product to Albuquerque.  For example, Professor White attributes a market share to Chevron because it takes title from Western in El Paso and ships the product on its own line time.  It is not clear, however, how Professor White attributed these market shares.

267.   While Professor White did not use the level of concentration in his econometric or simulation analyses, see Hearing Transcript at 659:8-11 (White), the FTC nevertheless contends it meets the prima facie standards based on the levels of concentration and change in concentration found in Professor White's concentration analysis.

268.   While Professor White's concentration analysis satisfies the minimum levels set out in the Merger Guidelines, his findings, based on recent studies by the FTC and the FTC's recent enforcement record, do not appear to represent substantial proof of anti-competitive effect.  For

example, two FTC Bureau of Economics working papers analyzed two petroleum industry mergers that the FTC did not challenge to determine whether the mergers adversely affected gasoline prices and consumers.  See Defendants' Hearing Exhibits, CV (Economic Effects of the Marathon-Ashland Joint Venture, dated May 7, 2007); Defendants' Hearing Exhibits, CW (Michigan Gasoline Pricing and the Marathon-Ashland and Ultramar Diamond Shamrock Transaction, dated July 2005).

269.    In the first such analysis, a retrospective study of the Marathon-Ashland merger was performed.  See Defendants' Hearing Exhibits, CV at 3.  The transaction resulted in a post-acquisition HHI of 2,260 in Kentucky, an increase of 800 points.  Post-acquisition, the combined company had a market share of about thirty-two percent.  See id. at 8-9.  The FTC authors concluded that the acquisition had no effect on consumers in the area studied, despite the 800-point increase in the HHI.  See id. at 30.

270.    In the second analysis, the FTC found no impact from an increase in concentration resulting from Marathon-Ashland's acquisition of Michigan terminal assets from Ultramar Diamond Shamrock, despite the increase in Marathon-Ashland's market share from sixteen percent to twenty-four percent.  See Defendants' Hearing Exhibits, CW at 1 15.

271.    The market concentration that is projected if the proposed merger goes forward is also not substantial compared to the FTC's enforcement record since 2001.  Since that time, the FTC has not challenged an acquisition where there was a reduction from eight to seven firms after a merger.  See Defendants' Hearing Exhibits, CS (FTC, Horizontal Merger Investigation Data, Fiscal Years 1996-2005, dated January 25, 2007).

## B.   THE COMBINED MARKET SHARE YIELDS A PRIMA FACIE CASE OF UNILATERAL EFFECTS.

272.   Two competitive harms may arise from a merger: "coordinated and collusive effects" and "unilateral effects."  Hearing Transcript at 958:12-22 (Kalt).  Unilateral effects arise when a firm is or becomes dominant because of a merger.  See id. at 958:15-22.

273.   Concern about unilateral effects arises when "the merging party [is] . . . so large as to be a dominant firm where it could unilaterally move the market by its supply withholding" and sustain the supply withholding profitably.  Id. at 958:18-960:9.

274.   Professor White has no opinion regarding whether the merger effects he posits are the result of unilateral behavior.  See id. at 658:22-24 (White).  He did not analyze or study the issues.  See id. at 658:13-17.

275.   Likewise, Professor White has no opinion whether the effects he measures are, "in toto," harmful to consumers.  Id. at 706:7-11.  Professor White's analysis excludes many areas where Giant sells, so he has no opinion about whether the merger will reduce output across all markets or result in a net increase in prices across those markets.  See id. at 706:1-5.

276.   Nonetheless, the Merger Guidelines explain that, in certain circumstances, "merging firms may find it profitable to alter their behavior unilaterally following the acquisition by elevating price and suppressing output."  Defendants' Hearing Exhibits, CG at § 2.2.  The Merger Guidelines distinguish between unilateral effects created by a merger among "firms distinguished primarily by differentiated products," id. at § 2.21, and those created by a merger among "firms distinguished primarily by their capacities," id. at § 2.22.

277.   Gasoline is not a highly differentiated product.  See Defendants' Hearing Exhibits,

GC at 7.  Because gasoline is a fungible product, § 2.22 of the Merger Guidelines covering unilateral effects in more homogenous markets should govern the FTC's analysis.  See Defendants' Hearing Exhibits, CG at § 2.2.

278.     The Merger Guidelines state that, "[w]here products are relatively undifferentiated and capacity primarily distinguishes firms and shapes the nature of their competition, the merged firm may find it profitable unilaterally to raise price and suppress output."  Defendants' Hearing Exhibits, CG at § 2.22.

> [If] the merging firms have a combined market share of at least thirty-five percent, merged firms may find it profitable to raise price and reduce joint output below the sum of their premergers outputs because the lost markups on the foregone sales may be outweighed by the resulting price merger on the merged base of sales.

Id.  That anti-competitive effect  is still unlikely, however, unless a sufficiently large number of the merged firm's customers cannot find economical alternative sources of supply.  See id.

279.     Professor White estimates a combined share for Western and Giant of 18.6 percent, see Hearing Transcript at 684:16-685:1 (White), which is less than the thirty-five percent threshold stated in the Merger Guidelines.  This market share is less than the market share that a firm that is considered dominant and capable of creating a unilateral effect typically holds -- sixty to seventy percent.  See id. at 959:18-960:9 (Kalt).

280.     Thus under either Professor Kalt's analysis (combined share -- 5.6 percent) or Professor White's analysis (combined share --18.6 percent), the merger would fall outside of the Merger Guidelines' triggering thresholds, and the FTC has not established its prima facie case of unilateral effects.

281.     Recognizing this deficiency, Professor White  calculated "alternative market shares"

designed to overcome that provision. Professor White calculated his alternative market shares by assigning Chevron's gasoline shipments on the Plains pipeline to Western. See Plaintiff's Hearing Exhibits, PX04063 at 013.

282.    In response to a hypothetical question, Professor White responded that, if Chevron buys product in El Paso and ships it to Albuquerque using its own line time, "then that would be share owned and provided, therefore, by Chevron." Hearing Transcript at 693:14-18 (White). If Chevron bears the economic exposure to price movements, assigning Chevron's share to Western is inappropriate. See id. at 696:3-11. According to Professor White, if a firm supplies gasoline to another firm and the second firm ships gasoline to Albuquerque over its own pipeline time, then the gasoline rightly belongs for bulk supply calculation purposes to the firm whose line time was used to ship it. See id. at 721:6-16.

283.    Assigning Chevron's market share to Western is also improper because Chevron has flexibility on the sources of its supply to northern New Mexico and has frequently sought to obtain more favorable terms from Western. *[SEALED PORTION REMOVED].* Chevron's move was based on the lower price Flying J offered to transport gasoline over the Longhorn pipeline from the Gulf Coast.

284.    Further, Professor White could not explain his methodology or principles in reassigning Chevron's share but not the share of other market participants. *[SEALED PORTION REMOVED].* Nor did he know whether he had or should have made any adjustment to Holly's share or the share or other suppliers. He did not include Alon, did not include Gulf Coast refiners, and did not include other trucking into Albuquerque. See Plaintiff's Hearing Exhibits, PX04063 at 013.

## C.    OTHER SUPPLIERS WILL RESPOND TO ANY UNILATERAL ATTEMPT TO DIVERT OUTPUT.

### 1.    The Alleged Future Diversion is De Minimis.

285.    This case was brought because of the FTC's assessment that "if there [is not] a merger Giant will bring . . . some expanded volumes to Albuquerque or the northern New Mexico area . . . [on] the order of 900 barrels a day."   Hearing Transcript at 961:6-13; 977:14-18 (Kalt).  The FTC fears that, if the merger goes forward, Western would divert this volume away from Albuquerque. The amount of volume at issue is equivalent to four or five truckloads.  See id. at 962:7 (Kalt).

286.    The amount of gasoline that the FTC alleges would be diverted from Albuquerque is small and would have little or no significant impact on price.   See id. at 881:11-15 (Stevens). Nine hundred barrels is less than one percent of Western's total daily production and less than half of one percent of the anticipated Western/Giant total expected daily production.  See id. at 751:25-752:5 (Foster).

287.    According to Western's CEO:

> You are talking about a market of 50[-]60,000 barrels a day.  They are barrels sourced to the market . . . from all directions, all different kinds of suppliers.  In addition to the refineries that supply you have a number of people that have exchange barrels in the market.  800 barrels a day is just -- I mean, if Giant decided that they wanted to try to push 800 barrels a day into that market, [] the demand is not going to change.  It [is] a fixed demand in the market, and if they push those barrels into the market somebody else is going to ship through the barrels.  There are a lot of truck barrels coming in, a lot of pipeline barrels from different directions.  Somebody might, if they want to use all of the pipeline space, ship a little more diesel, a little more gasoline.  It will balance . . . .

Id. at 751:4-24.  The Court does not believe these few additional barrels will significantly impact the market, or reduce the price as much as the FTC projects.

## 2. **There Is Sufficient Capacity to Supply the Market.**

288. There is an ample supply of gasoline available to the northern New Mexico market. **[SEALED PORTION REMOVED].** The testimony of these suppliers indicates that they have, can, and will respond to changes in supply volumes in northern New Mexico.

289. The only fact-witness testimony indicating that northern New Mexico faces gasoline supply shortages came from James Conway of Conway Oil.  Conway lives full-time in Michigan and describes himself as being semi-retired.  See id. at  360:19-361:7 (Conway).  He also admitted that the entirety of his testimony on gasoline supply consisted of personal opinion that was based on second-hand knowledge.  See id. 370:24-374:14.

### a. **ConocoPhillips.**

290. ConocoPhillips' supply into Albuquerque is predominantly branded.  See id. at 383:20-24 (Morrison).

291. In supplying its branded product into Albuquerque, ConocoPhillips arranges contracts with its branded wholesalers under which the terms negotiated include volumes, pricing, and duration.  See id. at 384:23-385:15.

292. The typical contract is based on the daily rack price and has a duration of three years with the possibility of an extension. See id. at 384:23-385:2; 386:3-12.

293. The limited unbranded sales that ConocoPhillips has are also generally under contract -- for a period of a year.  See id. at 387:18-388:3.

294. ConocoPhillips prefers contracting its gasoline sales in Albuquerque because it guarantees ratable sales -- consistent sales into a market, which help in turn to develop long-term relationships.  See id. at 388:4-16; 398:25-399:4.

295.     Even if margins are attractive in northern New Mexico, as they currently are for the Borger refinery, ConocoPhillips has not considered sending more supply into the market other than that for which it has pre-arranged sales through supply contracts.  See id. at 398:17-24.

296.     ConocoPhillips will not send unobligated gasoline bulk supply into Albuquerque because the market does not have an unbranded open rack system within which ConocoPhillips is established.  See id. at 399:5-15.

297.     Any uncommitted supply the ConocoPhillips's Borger refinery may produce could be shipped east on the Gold line even though Albuquerque is its highest margin market.  See id. at 403:11-20.

298.     There does not appear to be any supply constraints limiting the ability of ConocoPhillips to sell gasoline in Albuquerque.  ConocoPhillips' Borger refinery has expanded its capacity to 146,000 bpd in 2006 from 125,000 bpd in 2001.  See Defendants' Hearing Exhibits, GC at 25.

299.     Excess capacity on the ATA pipeline provides ConocoPhillips with the ability to send additional gasoline into Albuquerque.  See Hearing Transcript at  413:19-414:4 (Morrison).

300.     ConocoPhillips has recently studied increasing the capacity of the ATA pipeline and believes that with the use of a drag-reducing agent, it could increase the capacity of the line from 37,000 bpd to 45,000 bpd.  See id. at 414:9-416:15.

301.     ConocoPhillips has announced that it will expand capacity at three of its refineries, including Borger, from a combined total of 452,000 bpd to 600,000 bpd by 2015.  See Defendants' Hearing Exhibits, EQ at 25.  In addition, ConocoPhillips is currently undertaking a 25,000 bpd coker expansion, which will allow Borger to process heavier crude oils, increase product yield, and

increase production of gasoline.  See id.

302.    ConocoPhillips also has excess capacity at its Albuquerque terminal.  See Hearing Transcript at 417:2-4 (Morrison).  Finding customers who are willing to purchase increased supply is a limiting constraint to sending more gasoline into Albuquerque.  See id. at 402:21-403:10.

303.    Because Albuquerque has higher netbacks than many of the other markets into which ConocoPhillips sells, see id. at 389:10-390:13, ConocoPhillips has attempted to increase its sales into Albuquerque, see id. 391:19-392:10.

304.    Because Albuquerque is not a spot market for gasoline, see id. at 401:8-401:14, ConocoPhillips must line up customers in advance to purchase additional gasoline being sent to its Albuquerque terminal, see id. 398:17-398:24.  Likewise, ConocoPhillips has difficulty selling gasoline to wholesalers or retail customers who are under contract with other suppliers.  See id. 395:25-396:8.

305.    ConocoPhillips' initial efforts to increase sales into Albuquerque were not particularly successful.  See id. at 393:17-394:4.

306.    Starting six months to a year ago, however, ConocoPhillips refocused its efforts to increase gasoline sales into Albuquerque.  It implemented a new branded incentive program that allowed its sales force to customize discounts for individual regions, increased its advertising for Albuquerque, and is working with its customers to increase its business in Albuquerque.  See id. at 390:18-391:15; 396:15-396:24.

307.    ConocoPhillips has also changed its nationwide marketing strategy to make more gasoline available for shipment into more profitable markets such as Albuquerque.  It has withdrawn supply from less profitable markets, such as the upper Midwest, to make product available in excess

-58-

of its contractual obligations.  See id. at 400:23-401:7; 417:5-417:8.

308.    ConocoPhillips plans to send some of the supply that was going to less profitable markets to Albuquerque.  See id. at 417:9-15.  ***[SEALED PORTION REMOVED]***.

309.    ***[SEALED PORTION REMOVED]***.

310.    Professor White finds that the testimony of Morrison is consistent with a firm seeking the highest netback by moving product from low to high netback areas.  See id. at 671:13; 672:3 (White).

### b.    Valero.

311.    Valero has expanded the capacity of its McKee refinery by 11,660 bpd since 2002.  See Defendants' Hearing Exhibits, GC at 25.  ***[SEALED PORTION REMOVED]***.  The McKee fire will have no long-term impact on McKee's refinery production capacity.  See id.

312.    ***[SEALED PORTION REMOVED]***.  These changes enabled Valero and NuStar to get "150 percent more product through the terminal" than they could before.  Id.  If Valero saw an opportunity to increase its supply to Albuquerque, it would probably take that opportunity.  See id. at 475:22-476:5.

313.    Valero's Senior Manager for Supply and Distribution confirmed that, while the Arizona markets offer Valero's highest "netbacks" out of the McKee refinery, see id. at 470:2-7, ***[SEALED PORTION REMOVED]***.

314.    Valero has responded to opportunities in favorable netback markets in the past.  When the Kinder Morgan East pipeline opened in July of 2006, Valero expanded the amount of product it was sending from McKee to El Paso to take advantage of the opportunity to send additional product to Arizona's high netback markets over the Kinder Morgan pipeline.  See id. at 470:2-23.

315.    Finding customers willing to purchase the product is a constraint on Valero's expansion.  "You can't just fill the tanks and just leave them there.  You have to have a place to go with it."  Id. at 475:22-476:5.

316.    Valero's Albuquerque prices are generally better than its Amarillo prices.  See id. at 449:5-7.

317.    In 2006, even when prices increased relative to Amarillo, Valero did not ship more gasoline to Albuquerque.  See id. at 476:11-18.

318.    Valero's Albuquerque prices were better in 2006 than they were in 2005.  See id. at 476:11-14.

319.    In 2006, Valero did not ship, to any appreciable extent, more from its McKee refinery to Albuquerque than it did in 2005.  See id. at 451:21-25.

320.    Nevertheless, the reaction of southwestern refiners to Valero's recent refinery fire illustrates the willingness and ability of area refineries to supply additional product to Albuquerque.  During the time period when McKee was unable to produce any gasoline or other refined products, Valero was "absolutely" able to purchase product from other area bulk suppliers to make up for its lost production.  Id.  at 465:9-20; 467:13-19.

321.    One of the refiners that supplied Valero with a significant amount of product during the McKee refinery shut-down was Western.  See id. at 465:21-23.  Western supplied Valero with 5,000 bpd of product to meet Valero's Arizona and El Paso supply needs, and ultimately supplied Valero "to the tune of 100 [-] 200,000 barrels."  Id. at 465:24-466:7.  Western attempted to postpone a planned refinery turnaround to assist Valero following the McKee refinery fire.  See id.  Western "got in late in the game, but they came in gangbusters."  Id. at 467:13-19.

322.    Similarly, ConocoPhillips assisted Valero following the McKee refinery fire by supplying Valero with 20,000 bpd from its Borger refinery.  See id. at  466:6-467:12.  Alon and Giant were also willing and able to supply additional product to Valero to make up Valero's product shortfalls.  See id. at 467:6-12.

c.    Holly.

323.    Holly has increased the capacity of its Artesia refinery from 60,000 bpd in 2002 to 83,000 in 2006, an increase of thirty-eight percent.  See Defendants' Hearing Exhibits, AZ (Holly Corp. 10-K, for December 31. 2005) at 14;  Defendants' Hearing Exhibits, BA at 13.

324.    *[SEALED PORTION REMOVED].*  In addition, Holly has expanded its supply of gasoline to northern New Mexico by shifting the mix of products it offers.  For example, in late 2000, Holly added gasoline to the products it sent to its terminal at Moriarty.  See id. at 494:15-24. At the time it added gasoline at Moriarty, Holly did not have existing contracts for the additional supply, but had determined that there was customer demand.  See id. at 494:25-495:9.

325.    Holly plans to expand its refinery's capacity by another 2,000 bpd, to 85,000 bpd by the end of 2007, and will add another 15,000 bpd by the end of 2008, bringing its total refining capacity to 100,000 bpd.  See id. at 491:21-492:4; 496:2-5; 967:16-19 (Kalt); Defendants' Hearing Exhibits, BA at 13-14.

326.    Holly has 21,000 bpd of excess capacity on its pipeline, based on Holly's current shipping of 24,000 bpd and an achievable capacity of 45,000 bpd.  See Hearing Transcript at 485:24-486:3; 487:2-5; 496:16-497:1 (White).  To reach the full capacity of the pipeline, Holly need only turn on, or make minor modifications to, existing pumps along the line.  See id. at 496:16-497:1.

327.    Holly responded aggressively as Giant's crude oil supply dwindled.  Giant's

-61-

dwindling crude supply was a  sustained structural change in the market, and Holly responded to it. See id. at 968:17-24 (Kalt).  ***[SEALED PORTION REMOVED]***.

328.    Holly has indicated that, if there is new demand in Albuquerque, Holly will consider meeting it with new supply.   See id. at 497:12-17 (White).   Holly's actions support its stated intentions.  ***[SEALED PORTION REMOVED]***.

329.    ***[SEALED PORTION REMOVED]***.

**d.    Alon.**

330.    Alon has expanded its Big Spring refinery by 8,000 bpd since 2002 -- from 61,000 to 70,000 bpd.  See Defendants' Hearing Exhibits, GC at 25.

331.    ***[SEALED PORTION REMOVED]***; Hearing Transcript at 967:10-11 (Kalt).

332.    Alon also has available headroom on its exchange agreement with Holly.  ***[SEALED PORTION REMOVED]***.

333.    ***[SEALED PORTION REMOVED]***.

334.    Professor White is unaware of the headroom under the Alon-Holly exchange agreement.  See Hearing Transcript at 692:2-15 (White).  Professor White has not reviewed the Alon-Holly exchange agreement, nor has he reviewed the trial testimony of Greg White, from Holly, regarding that agreement.  See id. at 691:14-692:1.

**e.    Western.**

335.    Since Western's acquisition of the Chevron refinery in 2003, Western has increased the capacity of its integrated El Paso facility from approximately 83,000 bpd to 124,000 bpd.  See id. at 735:14-18 (Foster). Western is also expanding its refining operations by 6,000 to 9,000 bpd. See id. at 966:12-15 (Kalt).

f.       **Longhorn Pipeline.**

336.     Flying J's purchase of the Longhorn pipeline in August of 2006 has introduced substantial additional capacity for the bulk supply of gasoline to northern New Mexico.  See Defendants' Hearing Exhibits, GC at 26.

337.     ***[SEALED PORTION REMOVED].***  Longhorn has announced an expansion, increasing capacity by adding new pumping stations enabling additional product to move to El Paso. The expansion will increase the throughput capacity of the Longhorn pipeline from 72,000 bpd to 125,000 bpd.  See Defendants' Hearing Exhibits, DD (Longhorn Pipeline Moving Closer to Max Capacity, Houston Business Journal, dated April 23, 2007);  Hearing Transcript at 965:12-25 (Kalt).

338.     ***[SEALED PORTION REMOVED].***

339.     Professor White did not analyze the volume of gasoline moving over the Longhorn pipeline into El Paso.  See id. at 669:20-670:2.

340.     Professor White did not analyze whether product from the Gulf Coast flowing over Longhorn could defeat a price increase in the greater Albuquerque area.  See id. at 670:3-8.

g.       **Plains Pipeline.**

341.     The Plains pipeline is considering an expansion of its line from El Paso to Albuquerque and has conducted a detailed engineering analysis to expand the pipeline.  The potential expansion would increase the capacity of the line and allow approximately 15,000 to 20,000 bpd of additional product to be shipped from El Paso to Albuquerque within a year and a half.  See id. at 965:15-21 (Kalt); Russell Deposition at 23:5-26:1.

342.     In 2006, Plains approached Western to determine its interest in supporting an expansion of the Plains pipeline.  See Hearing Transcript at 875:4-875:13 (Stevens).  After Plains

purchased the pipeline running from El Paso to Albuquerque, it again approached Western executives to determine their interest in expanding the Plains pipeline.  In response, Western committed to shipping an additional 3,000-5,000 bpd if the Plains pipeline was expanded.  See id. at 875:14-22.

343.    Numerous other suppliers have expressed an interest in supporting the Plains pipeline expansion.  ***[SEALED PORTION REMOVED]***.

344.    ***[SEALED PORTION REMOVED]***.

345.    ***[SEALED PORTION REMOVED]***.

346.    ***[SEALED PORTION REMOVED]***.

347.    ***[SEALED PORTION REMOVED]***.

348.    ***[SEALED PORTION REMOVED]***.

349.    ***[SEALED PORTION REMOVED]***.

350.    ***[SEALED PORTION REMOVED]***.

351.    According to Professor White's analysis, he estimates that Giant will ship 810 bpd more gasoline into the greater Albuquerque area once its crude oil pipeline comes on line.  See id. at 668:4-12 (White).  Professor White's projected 810 bpd supply increase by Giant is made less significant by Plains' 15,000-20,000 bpd pipeline expansion from El Paso to Albuquerque.  See id. at  966:5-10 (Kalt).

352.    ***[SEALED PORTION REMOVED]***.

**h.    Trucking.**

353.    Professor Kalt's analysis indicates that at least 1,400 bpd of gasoline are trucked to Albuquerque.  See Hearing Transcript at  947:9-948:7 (Kalt).

354.     Between March 2006 and the end of January 2007, after its acquisition of the Longhorn pipeline, Flying J had trucked approximately 967,444 barrels from Texas to New Mexico. This volume represents an average of approximately 2,650 bpd being trucked from Texas to New Mexico.  See Defendants' Hearing Exhibits, GC at 26-27.

355.     *[SEALED PORTION REMOVED]*.

356.     Flying J has moved over 100 trucks into the El Paso market and has talked about expanding its truck rack capacity, thus improving the speed at which it can load trucks.  See id. at 509:21-510:4 (White).

357.     *[SEALED PORTION REMOVED]*.

358.     Love's, a customer of Giant, also testified that they secure gasoline and diesel supply for Albuquerque retail outlets from multiple locations outside of Albuquerque.  See Defendants' Designation at 136-46, filed May 19, 2007 (Doc. 223-2)(Deposition of Brad Jenkins, taken May 2, 2007) at 12:19.  When supply is tight, Love's trucks product into Albuquerque from Amarillo, El Paso,  Phoenix, and Winslow, Arizona.  See id. at 12:1-13:8.  Love's performs a computer analysis to compare markets and then determines how best to use its trucks and common carriers to secure the lowest-priced product.  See id. at 33:18-34:10.  Love's performs this analysis four times per day.  See id.  Love's can respond to changing prices in the market in under one day.  See id. at 34:6-35:1.

## D.     SUPPLIERS CAN DISCIPLINE A UNILATERAL ATTEMPT TO INCREASE PRICES IN ALBUQUERQUE.

359.     Professor White acknowledges that firms can discipline the market without changing supply in response to price changes.  See Hearing Transcript at  672:4-10 (White).  According to Professor White, firms need only to be willing to supply to discipline the market.  See id. at  672:11-

13. Professor White's simulations did not include, per se, an analysis of the willingness to supply of ConocoPhillips, Valero, or Holly. See id. at 672:14-25.

360. Professor White has not analyzed whether Holly "would" discipline an attempted price increase in Albuquerque. See id. at 676:10-20.

### E. CUSTOMERS WILL DISCIPLINE ANY UNILATERAL ATTEMPT TO REDUCE OUTPUT.

361. Chevron has substantial buyer-power and leverage with Western, and Chevron receives a favorable price. Because Chevron has substantial flexibility on the sources of its supply to northern New Mexico, Chevron has frequently sought to obtain more favorable terms from Western. *[SEALED PORTION REMOVED]*.

362. *[SEALED PORTION REMOVED]*.

363. *[SEALED PORTION REMOVED]*.

364. *[SEALED PORTION REMOVED]*.

365. *[SEALED PORTION REMOVED]*.

366. *[SEALED PORTION REMOVED]*.

367. *[SEALED PORTION REMOVED]*.

368. The Flying J offer to Chevron shows "that parties like Chevron can take advantage of, go shopping over, seek supplies that originate in Gulf Coast refineries." Id. at 983:20-25 (Kalt). It shows that "Chevron shares that perception, that it does have the ability to go shopping -- that is, to look for alternative supplies across multiple refinery supply sources." Id. at 983:8-11.

369. Professor White acknowledges that Chevron could buy from Flying J in El Paso and ship to Albuquerque over Chevron's line time. See id. at 699:18-700:10; 700:1-5 (White).

Professor White also acknowledges that Chevron could buy on the Gulf Coast and ship up the Longhorn pipeline to El Paso and then over the Plains pipeline to Albuquerque.  See id. at 700:6-10.

370.   ***[SEALED PORTION REMOVED]***.

371.   Shell's ability to change the price it paid to Western during the Hurricane Katrina/Rita period from Gulf Coast pricing -- which was disadvantageous to Shell but advantageous to Western -- to Albuquerque-based pricing illustrates how large buyers can renegotiate pricing terms during the life of a contract.  See id. at 982:3-15 (Kalt).

372.   Professor Kalt testified that economists familiar with the oil industry know that "there are no firm contracts in the petroleum industry, in the sense that, when things" get out **of "whack in** the market," the contracts "get adjusted."  Id. at 981:19-25.

373.   ***[SEALED PORTION REMOVED]***.  Giant's contract with Shell allows Shell to elect for the next month whether it pays Giant Albuquerque OPIS minus five or Gulf Coast plus seven and terminaling.  See Defendants' Hearing Exhibits, BP; Defendants' Hearing Exhibits, AJ (Investigational Hearing) at 145:12-146:18 (Matthew)(dated January 11, 2007).

374.   ***[SEALED PORTION REMOVED]***.

**F.   MARKET EVENTS CONFIRM THAT UNILATERAL WITHDRAWING OF PRODUCTION DOES NOT RESULT IN CHANGES IN OVERALL VOLUME.**

375.   Where available, the antitrust agencies rely extensively on natural market experiments to provide relevant evidence to show whether or not a transaction is likely to lessen competition. "'Natural experiments,' i.e., evidence that the posited harm has occurred under circumstances similar to the proposed transaction, are relevant to merger analysis."  Defendants' Hearing Exhibits, DQ (Statement of Chairman Majoras, Commissioner Kovacic, and Commissioner Rosch Concerning the

Closing of the Investigation Into Transactions Involving Comcast, Time Warner Cable, and Adelphia Communications) at 2.

376.    Giant's declining crude oil supply has not resulted in higher prices in Albuquerque. See Hearing Transcript at 968:17-24 (Kalt); 826:16-21 (Ericksen).  The natural experiment indicates "that there was enough supply to prevent there being, in a growing market, growing demand, upward pressure -- a trend of upward pressure on price."  Id. at 1039:22-25 (Kalt).  See id. 968:17-24; 1040:2-5.  There is no evidence in the data "of a sustained elevation of price" coinciding with Giant's declining crude oil supply and declining output.  Id. at 1039:9-12.  See id. at 1038:24-1039:5. Professor Kalt indicates that "there is [not] evidence in this analysis that the contraction of Giant's crude oil availability was putting upward pressure on price."  Id. at 1042:21-23.  That result is the same whether the crude oil price series used in the analysis was annual or monthly.  See id. at 1042:23-25.

377.    When Giant was forced to decrease their output because of refinery outages, Giant increased its purchases of refined product from third parties, including Western.  As the refinery supply came back on line, Giant's refinery supply displaced these purchases made from third parties. See Defendants' Hearing Exhibits, CG at 59-60.   The net result was no change in the market equilibrium. See id. at 59.

### G.     WESTERN HAS NO INCENTIVE TO DIVERT SUPPLY POST-MERGER.

378.    With its relatively small post-acquisition market share, a combined Western-Giant entity will have no incentive to attempt to restrict bulk product supplies or raise prices in Albuquerque.  *[SEALED PORTION REMOVED]*.

379.    Western also does not make product output decisions to affect the price of gasoline.

Contract obligations and future contract potential with customers drive Western's incentives.

**[SEALED PORTION REMOVED]**.

380.     Western makes decisions about product mix based on various market factors, including demand.  "In some circumstances [they] might not make what would appear to be the rational decision.  In other words, just because gasoline is higher priced does [not] mean [Western is] going to maximize gasoline if [Western] ha[s] an excessive diesel demand [they] have to meet, and in most cases [they] do." Id. at 770:1-11 (Foster).

381.     Western does not make supply decisions to affect price based on the Albuquerque component of the Chevron agreement.  Instead, the two biggest factors in Western's supply decisions are customers' needs, and its pipeline and transportation availability.  Western makes decisions on what to ship to Albuquerque based on the BNSF Railroad, which always needs as much as Western will give them.  See id. at 749:24-750:18 ("The bottom line is the way [Western] decide[s] what the mix is to Albuquerque, never once do[es] [Western] think about what the market is and the price is, is that Shell and Giant let [Western] know what their needs are.").

382.     Western will not make different supply decisions for Albuquerque after the merger.  See id. at 750:19-751:3 ("[V]irtually everything Giant sells in that market is for their own retail network and their network of jobbers and distributors.  There is no circumstance where Giant, or in a merged world Western, would ever short delivery to [itself].").

383.     Moreover, other than Giant, Western is only selling gasoline bound for Albuquerque to very large buyers; these buyers are Chevron, Shell, and occasionally Holly.  Western simply cannot count on being able to raise prices to these buyers post merger.  As noted earlier, Shell already has the ability to elect Gulf Coast pricing.  Chevron's ability to seek alternate supply sources

and to do so even while it has a contract with Western eliminates any incentive to divert supply after the merger.  See id. at 953:10-954:7 (Kalt).

384.    According to Professor White, the relevant supply for determining whether there is any change in incentives as a result of the merger is the volume of gasoline over which Western "could increase its prices post-acquisition."  Id. at 697:18-23 (White).

385.    Professor White acknowledges that Chevron could buy from Flying J in El Paso and ship to Albuquerque over Chevron's own line time.  See id. at 699:8-700:5.  Professor White also acknowledges that Chevron could buy on the Gulf Coast, and ship up the Longhorn pipeline to El Paso and then over the Plains pipeline to Albuquerque.  See id. at 700:6-10.

## H.    THE FTC'S THEORETICAL ANALYSIS OF UNILATERAL EFFECTS IS NOT BASED ON REASONABLE ASSUMPTIONS.

### 1.    The Analysis of the FTC's Industry Expert Presents Problems.

386.    The FTC's industry expert, David Ownby, is not an economist or an economic expert. See id. at 172:15-24 (Ownby).  Ownby has not worked for a refinery supplying New Mexico since the 1970's.  See id. at 173:24-174:2.  Ownby is not a refinery expert.  See id. 174:3-4.  The last time Ownby bought or sold a barrel of bulk gasoline in the northern New Mexico market was in the late 1980s.  See id. 272:2-5.

387.    Ownby did not evaluate trucking as a supply response.  He did not consider relevant trucking information, including data concerning the volumes of product trucked from Texas to New Mexico, and specific data showing trucking from Albuquerque to destinations west.  Ownby looked only at the limited trucking data that the FTC supplied to him.  *[SEALED PORTION REMOVED]*.

388.    *[SEALED PORTION REMOVED]*.

-70-

389.    ***[SEALED PORTION REMOVED]***.

390.    ***[SEALED PORTION REMOVED]***.

391.    ***[SEALED PORTION REMOVED]***.

392.    ***[SEALED PORTION REMOVED]***.

### 2.       The FTC's Econometric Analysis of the is Flawed.

393.    According to Professor White,

A good economic model should consider economic theory appropriate to the case at hand; it should consider specifics that are relevant for the specific industry that [is] being studied; it should consider appropriate data that reflect on the different dimensions of interest for the study of the model; and it should take into account the particular nature and quality of that data so that the statistical analysis can be applied to the economic model in the most effective and reliable way.

Id. at 537:15-23 (White).

394.    Professor White's analysis does not begin with a reasonable specification of the underlying economics of the marketplace.  See id. at 1015:16-17 (Kalt).  If economic principles dictate that a variable belonging in equations be estimated, "it should be in the model."  Id. at 1015:23-25.  Professor White "throws out what" his technique wants to throw out, and that is "not a proper mechanism for proceeding."  Id. at 1015:21-23.

395.    Professor White's analysis does not identify or provide information on supply curves or supply responsiveness.  See id. at 1016:11-13.  Professor White's analysis identifies only where supply and demand intersect in the market.  See id. at 1016:7-8.

396.    The FTC's "price down" and "price up" theories are flawed because they assume that firms do not maximize profits.  See id. at 963:12-964:1; 972:6-12; 973:1-976:19; 978:1-7; 979:10-25; 980:1-985:15.   The FTC's theory "implies a kind of blinders to profits, profit-making

opportunities." Id. at 963:18-19. According to Professor Kalt, "oil companies . . . have been profit-maximizing, profit-seeking" firms. Id. at 933:4-6. The FTC's assertions are not reasonable, because in the FTC's framework, oil companies "do not respond when they lose money, and they can't respond when they make money." Id. at 933:1-10.

397.   As Professor Kalt testified, the economic equilibrium that the FTC contemplates in its "price down theory" is "one in which everybody would be losing money, and [that] would [not] make sense." Id. at 1000:3-4.

398.   Professor White did not read the Holly-Alon exchange agreement, or the testimony of Holly's Greg White before rendering his opinion that Alon should be excluded. See id. at 691:14-692:1 (White). Professor White was unaware that Alon has headroom under the exchange agreement with Holly. See id. at 692:2-15.

399.   Professor White's analysis is also limited to the short term. The recent expansion of the Kinder Morgan East pipeline into Arizona demonstrates the fallacy of focusing on short-term movements in price. Although gasoline margins decreased momentarily after the initial 40,000 bpd expansion of the Kinder Morgan East pipeline, the decline was  temporary, because other barrels left the market in response. See id. at 902:23-903:20; 910:24-911:7 (Stevens).  Margins have since come back in Phoenix and are higher than margins in Albuquerque today.

400.   The FTC's theory is inconsistent with current behavior by ConocoPhillips, Plains, Western, Valero and Flying J.  See id. at 998:9-1001:8 (Kalt).  If the FTC's theory is correct, and everyone's "hands are tied," then all the parties supplying Albuquerque today have an incentive to withhold supply. Id. at 999:13-25; 1000:1. ConocoPhillips, however, plans to send some of the supply that was going to less profitable markets to Albuquerque. See id. at 417:9-15 (Morrison).

401.    Western's support for the Plains pipeline expansion and its planned refinery expansion, whether the merger goes through or not, is also consistent with a competitive post-merger market and inconsistent with a post-merger ability to exercise market power.  See id. at 966:16-967:8 (Kalt).  According to Professor White, Western should already be sending the maximum amount of diesel it can to BNSF each month.  The facts, however, are more persuasive to the Court than economic theory.  Contrary to Professor White's opinion, Western first offers its additional line time on Plains to Giant, then to Chevron, BNSF, and Holly.  See id. at 871:6-22 (Stevens).

402.    Likewise, Professor White's theory is inconsistent with actions in recent months.  In February 2007, Valero had a refinery outage in McKee.  In response to that outage, Western supplied Valero with gasoline to meet its marketing needs.  Western has similarly supplied Valero, ConocoPhillips, and Alon in times of product shortages.  See id. at 874:9-875:3; 881:24-882:11 (Stevens).

403.    Professor White  predicted price effects that make shipping by pipeline from El Paso to Albuquerque unprofitable.  See id. at 1003:6-1004:19 (Kalt).  This analysis, however,  "has an inconsistency in basic economics," because "people do not sit and lose money on a consistent basis." Id. at 1004:17-19.  Under Professor White's analysis, firms will continue to ship from El Paso up the Plains pipeline to Albuquerque even though, once gasoline gets to Albuquerque, it would be more profitable to take it back to El Paso by truck for sale than to sell it in Albuquerque.  See id. at 1006:5-12; 1012:2-20.

404.    Professor White's comprehensive merger simulation did not consider important and necessary issues.

405.    Professor White did not analyze the supply responsiveness of Alon, Chevron, Shell,

or the impact of trucking.  See id. at 1008:23-1009:13.  Nor did Professor White analyze the supply responsiveness of Western and Giant.   See id. at 1007:24-1008:22; 700:11-701:25 (White). Professor White did not include ethanol in his measure of supply.  See id. at 694:7-15 (White).

406.    Professor White did not consider how Giant could profitably reduce purchases from Western as it increases its own supply.  See id. at 702:1-17.  Similarly, Professor White did not consider the impact on Giant or his Albuquerque MSA market of expansions by the Plains pipeline, ConocoPhillips, or Holly.  See Hearing Transcript at 703:7-19.

407.    Professor White did not analyze total market supply in his supply-responsive analysis because he excluded trucking, see id. at 661:3-15, and he acknowledged that his simulations assume no supply response, see id. at 591:25-592:11.

408.    Professor White estimated that the demand elasticity for Albuquerque is, at least, between 0 and -.9354.  See id. at 603:10-15.  Professor White conceded that a true demand elasticity between 0 and -0.58 would result in his simulation showing that Giant would produce at less than full capacity.  See id. at 640:1-9.

409.    Professor White acknowledged that his simulation calculation produces different demand elasticity values for the four cities included in his model -- Flagstaff, Ciniza, Bloomfield, and Albuquerque.  See id. at 645:9-10.

410.    Professor White admitted that inventory changes can occur for reasons other than short-run price movements, but he nonetheless did not attempt to analyze inventory changes as part of his analysis of shipments.  See id. at 667:2-7.  He likewise did not analyze whether inventory changes were masking substantial differences between pipeline shipments and supply.  See id. at 667:12-15.  Professor White confirmed that some of the variables his LASSO roped into his supply-

response equations, such as the three-month T-bill rate, are related to inventory behavior.  See id. at 588:12-21.

411.    Professor White admitted that he was unaware of any refinery turnarounds during the period of time he analyzed and did not factor any such turnarounds in his analysis.  See id. at 667:8-11.

412.    Professor White acknowledged that he was not conducting statistical significance tests as part of his supply-response analysis.  See id. at 681:15-22.  The variables his LASSO methodology selected depend upon the amount of data available.  See id. at 582:18-25.  Professor White admitted that the data sets available to infer supply responsiveness were small.  See id. at 582:13-18.  He also admitted that a statistically significant relationship between Holly's shipments and prices in markets where it actually sells would be informative, but he did not do that analysis.  See id. at 681:15-682:22.

413.    As part of his supply-responsiveness analysis, Professor White did not analyze relative prices between markets where suppliers like Holly sell.  See id. at 680:15-681:2.  Professor White does not know how his analysis would be affected if he had used prices in the markets where firms sell.  See id. at 681:3-7.  Professor White's analysis of Holly was "only designed to determine whether they were responsive or not to the price differential between Albuquerque and Artesia."  Id. at 683:20-23.

414.    With respect to Holly, the only variables Professor White concluded were related to Holly's supply responsiveness were the "New Mexico continued unemployment claims and the previous two-month shipments by Holly."  Id. at 684:7-11.

415.    Professor White could not explain the difference between the capacity he used for

Giant and the capacity projections found in Giant's internal documents. <u>See</u> <u>id.</u> at 674:7-676:1.

Professor White shows Giant output in certain years that is greater than Giant's capacity according

to the contemporaneous documents. <u>See</u> <u>id.</u> at 724:2-13.

## XIII.   THE FTC'S THEORY THAT GIANT WILL CAUSE THE PRICE IN ALBUQUERQUE TO DECREASE DRAMATICALLY IS NOT REASONABLE.

### A.   THE FTC's THEORY RELIES HEAVILY ON ITS INTERPRETATION OF A DRAFT GIANT INCREMENTAL PRODUCTS MARKETING DOCUMENT.

416.   The FTC's theory of competitive harm from Western's proposed acquisition of Giant

rests on a draft incremental products marketing document created in 2005. <u>See</u> <u>id.</u> at 225:1-229:22

(Ownby); Plaintiff's Hearing Exhibits, PX00609.  The document contains various figures and budget

impacts that the FTC and its economic expert have concluded show the impact on prices of Giant

increasing refinery utilization and production at its Bloomfield and Ciniza refineries, and of putting

an additional 810 or 980 bpd of its gasoline supply into the Albuquerque area market.  <u>See</u> Plaintiff's

Hearing Exhibits, PX4063 at ¶¶ 92, 100, at 034, 037.  The draft Giant incremental products market

document forms the basis of Professor White's econometric merger simulation analysis.  Professor

White assumes that Giant will allocate its supply as set forth in the draft analysis to do the simulation

that shows prices falling in Albuquerque.  <u>See</u> Plaintiff's Hearing Exhibits, PX4063 at 034 n.28.

417.   Nine hundred barrels is equivalent to approximately five truckloads of gasoline. <u>See</u>

Hearing Transcript at 962:7 (Kalt).

418.   The incremental products marketing document upon which the FTC and Professor

White relies was a first draft. <u>See</u> <u>id.</u> at 846:2-24 (Matthew); Defendants' Hearing Exhibits, AJ at

117:17-119:23.  Scott Matthew, of Giant, who contributed the numbers for the draft, did not look

-76-

at any data or perform any backup calculations to create the numbers on the document. <u>See</u> Hearing Transcript at 846:2-24 (Matthew). Matthew and his group spent less than a day working on the document. <u>See id.</u>

419.    The document embodied an approach that was deemed unworkable and un-fixable. <u>See id.</u> at 846:2-847:9; 856:20-857:7.

420.    The document, or the original calculations of marketing areas for the incremental product, were not used; because the various numbers contained in the draft could not be validated, the document was discarded. <u>See id.</u> at 847:4-8.

421.    At the time the document was created, Giant did not have a formal written incremental products marketing plan. The marketing group had oral discussions about what to do with additional product from the refineries once the crude pipeline was operational, but no formal or written plan. Giant has never had a formal written marketing plan. <u>See</u> Defendants' Hearing Exhibits, AJ at 108:9-110:24.

422.    In July of 2005, Giant's management made a presentation regarding the **Texas-New** Mexico pipeline to Giant's Board of Directors. <u>See</u> Defendants' Hearing Exhibits, GE. The draft incremental product marketing document was not used in the presentation to the Board of Directors. <u>See id.</u>; Hearing Transcript at 847:4-8 (Matthew).

423.    Giant planning documents roughly contemporaneous with the documents upon which the FTC has relied indicate that the "market saturation" discount applies only on gasoline produced at Bloomfield. <u>See</u> Plaintiff's Hearing Exhibits,00645 (Texas-New Mexico Project Assumptions, dated September 28, 2004) at 008.

424.    According to Professor Kalt, the Giant draft document would "not [be] a competent

analysis if it is interpreted" as making predictions about price responsiveness or non-responsiveness in areas where Giant sells.  To "an economist . . . [the draft] does not represent an appropriate analysis."  Hearing Transcript at 1009:4-1011:8 (Kalt).

## B.   THE FTC'S THEORY IS INCONSISTENT WITH GIANT BEHAVING AS A PROFIT-MAXIMIZING FIRM.

425.   Giant evaluates the netbacks in various locations daily.  See id. at 839:21-22 (Matthew).  Giant makes the decision to market its product to the highest netback locations.  See id. at 839:2-9.  Giant makes adjustments in its supply based on the relative netbacks frequently, sometimes on a daily basis.  See id. at 839:10-24.  Giant will most likely market any additional product that will be available after the Texas-New Mexico pipeline comes online in a consistent manner -- i.e., Giant will try to market the product to the highest netback areas.  See id. at 843:24-844:4.

426.   Historically, the highest netbacks for Giant's Four Corners refineries have been in Arizona.  See id. at 839:14-19; 136:4-10 (Ownby); Defendants' Hearing Exhibits, AJ at 41:7-11.  Currently, the western side of the market reachable from Giant's Four Corners refineries provides the higher netback markets.  See Defendants' Hearing Exhibits, AF ¶ 6, at 3.

427.   Albuquerque offers the lowest netback market for Giant.  See id. ¶ 8, at 3; Defendants' Hearing Exhibits, AJ at 80:15-21.  Likewise, Arizona gasoline offers Western the best netback and, as a result, Western puts great effort into getting product into Phoenix.  See Hearing Transcript at 738:1-11 (Foster).

428.   **_[SEALED PORTION REMOVED]_**.

## C. AS A PROFIT-MAXIMIZING FIRM, GIANT LIKELY WOULD RATIONALLY REDUCE PURCHASES FROM WESTERN AS IT INCREASES ITS OWN SUPPLY.

429.     Giant regularly purchases gasoline to supply its own customers.  See id. at 831:4-12 (Matthew).  When Giant is short of refined product to fill its customer demand in Albuquerque, Giant purchases these volumes from third parties, including Western.  See id. at 832:12-21.  When Giant has additional production it purchases less from other suppliers.  Giant nominates purchases from Western on a monthly basis.  See id. at 845:2-7.

430.     Giant's monthly gasoline sales to northern New Mexico in the January 1997 to December 2006 period are more closely related to Giant's purchases of non-refinery volumes to provide the supply needed than they are to Giant's refining volume.  See Defendants' Hearing Exhibits, GC,  Figure 22.  Giant increases its purchases of refined products from third parties, including Western, when its refinery volumes decrease; when its refinery volumes are higher, Giant's increasing refinery supply displaces other sellers' volumes.  See id. at 59-60; Hearing Transcript at 971:8-10 (Kalt)("Giant has brought in and backed out non-refinery supply to supply customer demands.").  Giant's overall sales have been relatively stable, with steep drops in production filled in by temporary purchases from outside sources.  See Defendants' Hearing Exhibits, GC at 59-60; Hearing Transcript at 971:8-10 (Kalt)

431.     As a result of the variation in production, Giant's purchasing needs vary week-to-week and month-to-month.  It purchases more gasoline from Western when it needs additional gasoline to meet its distribution needs; likewise, it purchases less gasoline when it needs less.  See Hearing Transcript at 869:8-870:20 (Stevens).

432.     The amount Giant has been purchasing from Western has increased as a result of new

contracts with Shell in Albuquerque.  ***[SEALED PORTION REMOVED]***.

433.    ***[SEALED PORTION REMOVED]***.  Under the agreement, product was refined at Western's refinery in El Paso, shipped on Shell's line time on the Plains pipeline from El Paso to Albuquerque, and delivered to Shell at Giant's terminal in Albuquerque.  See id. at 871:23-872:18 (Stevens).

434.    Since February 2007, Giant has supplied the volumes to Shell under this contract by continuing to purchase them from Western.  See id. at 842:4-10 (Matthew).  ***[SEALED PORTION REMOVED]***.  Giant anticipated supplying these volumes from a shipper on Plains if the Texas-New Mexico pipeline was not yet online when the Shell contract began.  See Defendants' Hearing Exhibits, AJ at 138:1-15.

435.    Giant could decide to purchase fewer barrels from Western at any time.  See Hearing Transcript at 752:16-24 (Foster).  If Giant were to supply more of its own refined product to its customers in Albuquerque, Giant would most likely purchase less product from third-party suppliers, such as Western.  See id. at 844:22-845:2 (Matthew).

436.    In the last few months, Western has supplied Giant with approximately 3,500-4,000 bpd of gasoline via the Plains pipeline.  See id. at 869:24-870:19 (Stevens).  When Giant purchases product from Western, the product is shipped on the Plains pipeline primarily on Western's prorated line time.  See id. at 870:25-871:5; 832-33 (Matthew).  This amount is in excess of the incremental 980 bpd that Professor White suggests that Giant will ship into Albuquerque.

437.    Giant can displace more than 980 bpd of Western purchases without sacrificing its own line time.  According to Professor White's expert report, Giant shipped 21,998 barrels per month on its line time from December 2005 to November 2006, or approximately 733 bpd.  See

Plaintiff's Hearing Exhibits, PX04063 at 013.  Giant generally does not purchase product from Western to fill its line time.  Instead, it obtains barrels from Chevron in exchange for product that Chevron lifts from Giant's Flagstaff and Bloomfield terminals.  See Defendants' Hearing Exhibits, AJ at 27:23-28:23.

438.    Chasing customers in Albuquerque at a deep discount -- as the FTC asserts Giant will do -- is inconsistent with Giant's business practices.  Giant seeks to sell its refinery production, not to resell products that others refine.  See Hearing Transcript at 845:1-4 (Matthew)("I'm in the refining business.").  Giant has no economic incentive to purchase product from Western at market prices and then resell the same barrels at a discounted price.  See id. at 973:17-19 (Kalt).

439.    Accordingly, the FTC's assertion that Giant routinely ships most of its purchases from Western on its own Plains line time is not accurate.  Giant  now purchases 125,000 to 140,000 barrels per month from Western, see id. at 845:3-9 (Matthew), or approximately 4,167 to 4,667 bpd. That means that, even after reducing 980 bpd in purchases from Western, Giant would still need to purchase over 3,000 bpd from Western on Western's line time.  Giant would not have to touch its own minimal line time when reducing purchases from Western.

440.    Professor White "has not studied" whether Giant could increase supply to Albuquerque without prices falling by backing Western out of the market.  Id. at 701:12-703:6 (White).  Professor White made no effort to try to simulate this result.  See id. at 702:23-703:6. Professor Kalt studied this issue.  He concluded that Giant could avoid putting downward pressure on Albuquerque prices by rationally reducing purchases from Western.  According to Professor Kalt "the reasonable conclusion is" that Giant "would reduce its Western purchases.  I wouldn't hold those constant, it would reduce its Western purchases."  Id. at 973:9-10 (Kalt).  Thus, Giant can

expand its sales into Albuquerque -- without dropping the price of gasoline -- by taking less volume from Western.  See id. at 973:17-20.

441.  ***[SEALED PORTION REMOVED]***.

442.  Professor White's theory that price is going to drop by ten cents per barrel in Albuquerque if Giant puts an incremental 900 barrels into the Albuquerque market is unlikely.  As Foster explained, "nobody is even going to know those barrels" are there.  "[T]o the extent there are too many barrels [in Albuquerque], somebody is going to back out barrels.  The easiest, if Giant wants to control the situation themselves they will just buy fewer barrels from [Western]."  Id. at 752:12-24 (Foster).

### D.   WESTERN COULD SEND ADDITIONAL SUPPLY OF DIESEL TO BNSF IF GIANT REDUCED ITS PURCHASES FROM WESTERN.

443.  Because of this demand, Western offers to provide BNSF with diesel for any unused line time on the Plains pipeline each month.  The railroad has expressed an interest in accepting whatever additional off-road diesel Western can supply them.  See id. at 750:3-28; 871:6-22 (Stevens).

444.  According to Professor Kalt, if gasoline prices drop in Albuquerque, that change "upsets the equilibrium" in the market.  Id. at 974:1-4 (Kalt).  This change makes selling gasoline "relatively less profitable, both compared to other products you may be selling in the northern New Mexico area, like diesel," and causes shippers to shift to other more profitable products.  Id. at 974:4-7; 975:5-18.

445.  Although the Plains pipeline generally runs full, it has not been full of gasoline.  See id. at 975:3-5.

-82-

446.    When Giant does not need to buy from Western, it has historically reduced purchases from Western.  See id. at 971:8-10; 972:24-973:4.

**E.      BACKING OUT TRUCKING VOLUME AND SUPPLY FROM OTHER SUPPLIERS.**

447.    Even if Giant did not act as a profit-maximizing firm and continued to purchase the same amount from Western that it does before the refinery utilization increase, the FTC has conceded that the reasonable foreseeable effect of this action would be to reduce the marginal supply of gasoline to the Albuquerque area through trucking.  See Plaintiff's Pre-hearing Brief on Plaintiff's Motion for Preliminary Injunction at 8, filed May 4, 2007 (Doc. 185).  "If prices in the Northern New Mexico area fall this summer -- as Giant assumes and Dr. White confirms they will, when Giant's additional gasoline production meets the market -- any sporadic trucking from El Paso to Albuquerque will likely disappear."  Id.

448.    According to the FTC, as trucks from Ciniza and Bloomfield push gasoline in, trucks from Texas would withdraw.  Professor Kalt's trucking data, however, shows that the amount of gasoline trucked into Albuquerque is larger than the 980 barrel expansion the FTC posits.  See Defendants' Hearing Exhibits, GC at 23.  Because of the amount of trucking, backing out 980 bpd would not have a significant, if any, impact on Albuquerque volume or prices.

449.    Professor White did not study this trucking response.  See Hearing Transcript at 1009:11-13 (Kalt).  He could not offer an expert opinion regarding whether Giant would back out trucking from other suppliers if it expanded supply into Albuquerque with its own trucks.  See id. at 677:23-25 (White).

450.    Even if there were insurmountable impediments to existing market participants

expanding supply -- which there are not -- there is no evidence that there are significant impediments to withdrawing supply in the face of falling prices.  See id. at 978:1-7 (Kalt).

451.    According to Professor Kalt, even if Giant maintained purchases from Western while it expands refinery shipments to Albuquerque, other suppliers like ConocoPhillips, Flying J, and Valero would have an incentive to divert supplies away from the lower priced Albuquerque market to more profitable markets.  See id. at 975:21-976:19.

452.    The evidence on pipeline shipments by ConocoPhillips, Holly, and Valero demonstrates that they vary from month-to-month by an amount comparable to Professor White's projected supply increase.  See id. at 976:20-977:25.

453.    In the unlikely event that Giant's projected new shipments of gasoline did not reduce Giant's wholesale purchases from Western, as it has historically done, or did not reduce the amount of trucked supply into Albuquerque, existing suppliers would likely respond to decreasing netbacks in Albuquerque by withdrawing supply and sending it to more profitable markets.  See id. at 973:21-976:19.

## XIV.  THE FTC HAS NOT ATTEMPTED TO PROVE ANTI-COMPETITIVE COORDINATED EFFECTS.

454.    The existing pattern of behavior in supplying the northern New Mexico market with bulk gasoline is consistent with competition.  The conduct of suppliers and new entrants demonstrates the willingness of suppliers to expand supply and capacity to make additional supply available to the northern New Mexico market.  The bulk suppliers' actions indicate that Albuquerque is competitive.  See Defendants' Hearing Exhibits, GC at 23.

A.    **THE FTC DOES NOT APPEAR TO CONTEND THAT THE MERGER WILL RESULT IN ANTI-COMPETITIVE COORDINATED EFFORTS.**

455.    Although the FTC's Amended Complaint alleges that Western's proposed acquisition of Giant will result in an increased likelihood of collusion, <u>see</u> Amended Complaint ¶ 35(d)(iv), at 13, the FTC has presented no evidence in support of that allegation.  The FTC concedes that it "does not purport to show that coordination does now or has ever existed in northern New Mexico, and therefore, states no view as to specific mechanisms by which such coordination would occur." Defendants' Hearing Exhibit, F (Plaintiff's Response to Defendants Paul L. Foster's, Western Refining, Inc.'s and Giant Industries, Inc.'s First Set of Interrogatories) at 7.

B.    **THE FTC DID NOT INTRODUCE EVIDENCE OF ANY HISTORY OF COORDINATED BEHAVIOR IN ALBUQUERQUE.**

456.    Western's actions leading up to and during the merger discussions indicate that Western  has perceived the market to be competitive.  Western's actions include: (i) consistently filling to its maximum prorated share of Plains line time into Albuquerque; (ii) agreeing to supply Alon's short-term Albuquerque product shortfall resulting from a refining turnaround; (iii) agreeing to supply Valero's short-term product shortfall following Valero's February 2007 McKee refinery fire; and (iv) encouraging Plains to expand capacity between El Paso and Albuquerque.  Long-term price trends in Albuquerque and El Paso are consistent only with a competitively operating market, and external events, rather than anti-competitive collusive behavior, better explain any short-term price variations.  <u>See</u> Defendants' Hearing Exhibits, GC at 28, 43, 60.

C.    **THE FTC'S SPRING 2006 GASOLINE PRICING INVESTIGATION STUDY SUPPORTS THE CONCLUSION THAT ALBUQUERQUE IS OPERATING IN A COMPETITIVE MANNER.**

457.    In 2006, the FTC represented to Congress that the bulk petroleum supply markets

within the United States were operating in a competitive manner.  <u>See</u> Defendants' Hearing Exhibits, EJ (FTC, <u>Investigation of Gasoline Price Manipulation and Post-Katrina Gasoline Price Increases</u>, dated Spring 2006) at vi.  To support its investigation, the FTC analyzed a large volume of wholesale and retail pricing data, including data on gasoline prices in the Albuquerque area.  <u>See id.</u> at v, 95-96, 125, 131, 134, 136.  The FTC's investigation concluded that there was no evidence suggesting that any refiner was manipulating prices by any of the means the FTC's staff investigated.  <u>See id.</u> at vi-viii.

### D.   THE MERGER WILL NOT ELIMINATE A MAVERICK AS THE <u>MERGER GUIDELINES</u> DEFINE THAT TERM.

458.   Under the <u>Merger Guidelines</u>, the concept of a maverick is used in cases premised on tacit or coordinated behavior to describe competitors that, because of structural conditions or unique incentives, can prevent or limit anti-competitive coordinated interaction by other firms and "are unusually disruptive and competitive influences in the market."  Defendants' Hearing Exhibits, CG at § 2.12.  The FTC has not, however, presented evidence of past competitor coordination or the ability of firms to coordinate in the future.  There is also no evidence that Giant has acted as a maverick in the past, and Professor White did not testify that Giant is a maverick.

### XV.   THE DEFENDANTS DID NOT IDENTIFY MERGER-SPECIFIC EQUITIES.

459.   The FTC has indicated that its administrative review of this merger will take anywhere from thirteen to sixteen months.

460.   While Western's management has convinced the Court that its people will be able to operate Giant's refineries more profitably than Giant's management has done, the Defendants have identified few, if any, equities that are merger specific.  The Court is also convinced that there

-86-

will be efficiencies resulting from the merger. Furthermore, under the amended merger agreement, Western cannot terminate the merger without forfeiting its $25 million deposit to Giant. See Defendants' Hearing Exhibit, I at 6; Hearing Transcript at 753:23-754:3; 754:20-755:13 (Foster). Moreover, Western will abandon the merger if the Court grants the preliminary injunction. See Hearing Transcript at 753:20-22 (Foster). Nevertheless, if the FTC had shown the merger is likely to have an anti-competitive effect, these equities are not so great as to outweigh the harm from the merger.

461. Likewise, the FTC's equities do not so outweigh its failure to show likely anti-competitive effects that the Court should nonetheless enjoin the merger while the administrative process proceeds. There is not likely to be significant anti-competitive harm in the interim. Also, it will not be difficult to unscramble business operations if the merger is eventually undone.

462. On the record before the Court, the balance of the equities do not outweigh the Court's finding concerning the likelihood of success on the merits.

## CONCLUSIONS OF LAW

The prospect of financial gain motivates mergers. See Merger Guidelines at § 0.1. The Merger Guidelines "focus on the one potential source of gain that is of concern under the antitrust laws: market power." Id. "Market power in a seller is the ability profitably to maintain prices above competitive levels for a significant period of time." Id. "The unifying theme of the [Merger Guidelines] is that mergers should not be permitted to create or enhance market power or to facilitate its exercise." Id.

## I.  LAW REGARDING THE PRELIMINARY ENJOINING OF POTENTIAL ANTI-COMPETITIVE MERGERS.

1.      Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits a merger between two companies "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition . . . may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.  Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), authorizes the FTC to seek a preliminary injunction to halt a merger pending a full administrative hearing before the FTC when it has reason to believe that a company is violating, or is about to violate, section 7 of the Clayton Act.  See 15 U.S.C. § 53(b).  To obtain a preliminary injunction under section 13(b), the FTC must demonstrate: (i) a likelihood of success on the merits in its section 7 case; and (ii) that the equities weigh in favor of granting the injunction.  See FTC v. Swedish Match, 131 F. Supp. 2d 151, 155 (D.D.C. 2000).

2.      Ordinarily, to prevail on a motion for preliminary injunction, a moving party must show: "[I] that it has a substantial likelihood of prevailing on the merits; [ii] that it will suffer irreparable harm unless the preliminary injunction is issued; [iii] that the threatened injury outweighs the harm the preliminary injunction might cause the opposing party; and [iv] that the preliminary injunction if issued will not adversely affect the public interest." Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1246 (10th Cir. 2001).  Congress intended section 13(b) to depart from that traditional equity standard; Congress did not believe that the traditional preliminary injunction standard was "appropriate for the implementation of a Federal statute by an independent regulatory agency where the standards of the public interest measure the propriety and the need for injunctive relief." FTC v. H.J. Heinz Co., 246 F.3d 708, 714 (D.C. Cir. 2001)(quoting H.R. Rep. No. 93-624,

at 31 (1971)).   While section 13(b), insofar as it removes the irreparable harm element from   the

traditional preliminary injunction analysis, presents a lesser standard for issuance of a preliminary

injunction, see FTC v. Staples, Inc., 970 F. Supp. 1066, 1071 n.2 (D.D.C. 1997),  it does not provide

a near automatic, or easily met, standard that is highly preferential to the FTC.   According to the

Court's research, district courts deny the FTC's section 13(b) preliminary injunction requests

approximately thirty-five percent of the time.[3]

       3.       If Congress did not want federal courts to play some meaningful role in the injunction

process, it could have given injunction power directly to the FTC.   Congress did not structure the

process that way.   Despite Congress' lessening of what the FTC must show to secure a preliminary

injunction, the FTC's burden remains heavy, because the granting of any injunction by a federal

court is "an extraordinary and drastic remedy."   FTC v. Exxon Corp., 636 F.2d 1336, 1343 (D.C. Cir.

1980).

       4.       The need for caution in issuing a preliminary injunction is particularly important in

the merger and acquisition context, because "the grant of a temporary injunction in a Government

antitrust suit is likely to spell the doom of an agreed merger."   FTC v. Great Lakes Chem. Corp., 528

F. Supp. 84, 86 (N.D. Ill. 1981).   "[T]he issuance of a preliminary injunction blocking an acquisition

or merger may prevent the transaction from ever being consummated."   FTC v. Exxon Corp., 636

---

[3]

      Within Westlaw's "All District Courts Since 1944" database, the search entry "ti(Federal Trade Commission) and 'preliminary injunction' and 'Clayton Act' and 'merger' or 'acquisition' or 'transaction" yields sixty returns.   Of the sixty cases returned, thirty are relevant.   In sixteen of those thirty cases, district courts granted the FTC's requests for preliminary injunctions or denied them, but were reversed on appeal.   In eleven of those thirty cases, district courts denied the FTC's requests for preliminary injunctions or granted them, but were reversed on appeal.

F.2d at 1343.  "The reason a grant of a preliminary injunction will spell doom of an acquisition is apparent.  No substantial business transaction could ever survive the glacial pace of an FTC administrative proceeding."  FTC v. Occidental Petroleum Corp., No. 86-900, 1986 U.S. Dist. LEXIS 26138, at *23 (D.D.C. 1986).  The reality is that Western will not have an opportunity to engage in administrative litigation to allow the FTC to determine the competitiveness of the merger on a full and complete record.

### A.  LIKELIHOOD OF SUCCESS ON THE MERITS.

5.  "The objective of Section 7 of the Clayton Act is to prohibit only those acquisitions that may allow the combined entities to exercise market power by raising prices and restricting the availability of a product or service to customers."  Id. at **34-35.  See Merger Guidelines at § 0.1. Section 7 proscribes those mergers or acquisitions that "are likely to 'hurt consumers.'"  United States v. Rockford Mem'l Corp., 898 F.2d 1278, 1282 (7th Cir. 1990)(quoting Hosp. Corp. of Am. v. FTC, 807 F.2d 1381, 1386 (7th Cir. 1986)).  "[T]he Supreme Court, echoed by the lower courts, has said repeatedly that the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide the contemporary application of the antitrust laws, not excluding the Clayton Act."  Hosp. Corp. of Am. V. FTC, 807 F.2d at 1386.

6.  The FTC must show "'the reasonable probability' of a substantial impairment of competition to render a merger illegal under § 7.  A 'mere possibility' will not suffice."  FTC v. Fruehauf Corp., 603 F.2d 345, 351 (2d Cir. 1979)(citation omitted).  Section 7 is concerned with the loss of competition that is sufficiently probable and imminent, not with possibilities.  See, e.g., United States v. Citizens & S. Nat'l Bank, 422 U.S. 86, 122 (1975)("The Clayton Act is concerned with 'probable' effects on competition, no with 'ephemeral possibilities.'" (citation omitted)); United

States v. Marine Bancorporation, 418 U.S. 602, 622-23 (1974)(stating that Section 7 "deals in probabilities, not ephemeral possibilities" (citation omitted)).  As then-Judge, now Supreme Court of the United States Justice Clarence Thomas observed, "Section 7 involves <u>probabilities</u>, not certainties or possibilities."  <u>United States v. Baker Hughes, Inc.</u>, 908 F.2d 981, 984 (D.C. Cir. 1990).

7.     The question whether the merger violates section 7 of the Clayton Act is reserved for the FTC.  <u>See</u> <u>FTC v. Staples, Inc.</u>, 970 F. Supp. at 1071.  The FTC is not required to establish, nor is the trial court required to find, that the proposed merger would in fact violate section 7 of the Clayton Act.  <u>See</u> <u>FTC v. H.J. Heinz Co.</u>, 246 F.3d at 714.  "[T]he FTC's burden is not insubstantial, [however,] and 'a showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief.'"  <u>FTC v. Arch Coal, Inc.</u>, 329 F. Supp. 2d 109, 116 (D.D.C. 2004)(quoting <u>FTC v. Tenet Health Care Corp.</u>, 186 F.3d 1045, 1051 (8th Cir. 1999)).  To prevail, the FTC must raise "questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the [FTC] in the first instance and ultimately by the Court of Appeals."  <u>FTC v. Cardinal Health, Inc.</u>, 12 F. Supp. 2d 34, 45 (D.D.C. 1998)(quoting <u>FTC v. Univ. Health, Inc.</u>, 938 F.2d 1206, 1218 (11th Cir. 1991))(internal quotations omitted).  "[I]t is well settled in the case law that for the government to succeed, 'it must show a reasonable probability that the proposed [merger] would substantially lessen competition in the future.'"  <u>FTC v. Cardinal Health, Inc.</u>, 12 F. Supp. 2d at 45 (quoting <u>FTC v. Univ. Health, Inc.</u>, 938 F.2d at 1218).  <u>See</u> <u>United States v. Long Island Jewish Med. Ctr.</u>, 983 F. Supp. 121, 142 (E.D.N.Y. 1997)(holding that the government must demonstrate that there is a "reasonable probability the merged entity would increase prices above the competitive level for a prolonged

period").

8.    The United States Court of Appeals for the District of Columbia Circuit has articulated an analytical approach by which the FTC may establish a likelihood of success on the merits of their section 7 case.  See FTC v. H.J. Heinz Co., 246 F.3d at 715 (citing United States v. Baker Hughes, Inc. 908 F.2d at 982-83).  First, the FTC must demonstrate that the proposed merger would produce a firm controlling an undue share of the relevant market and would result in a significant increase in the concentration of the market.  See FTC v. H.J. Heinz Co., 246 F.3d at 715. "Such a showing establishes a presumption that the merger will substantially lessen competition." Id.  The FTC must establish a presumption that the merger will substantially lessen competition by producing evidence of undue concentration in a relevant geographic and product market.  See United States v. Baker Hughes, Inc., 908 F.2d at 982.

9.    If the FTC establishes such a presumption, a defendant can rebut that presumption by producing evidence that the market-share statistics produce an inaccurate account of the proposed merger's probable effects on competition in the relevant market.  See FTC v. H.J. Heinz Co., 246 F.3d at 715.  To rebut, a defendant may rely on non-statistical evidence that casts doubt on the persuasive quality of the ability of the FTC's statistics to predict future consequences, such as ease of entry into the market, the trend of the market toward or from concentration, and the continuation of active price competition.  See id. at n.7.  The defendant need introduce evidence sufficient to show "that the prima facie case inaccurately predicts the relevant transaction's effect on future competition." United States v. Archer-Daniels-Midland Co., 781 F. Supp. 1400, 1421 (S.D. Iowa 1991)(quoting United States v. Baker Hughes, Inc., 908 F.2d at 991).  The defendants may also demonstrate unique economic circumstances that undermine the predictive value of the FTC's

-92-

statistics.  See United States v. Archer-Daniels-Midland Co., 781 F. Supp. at 1421.

10.    "If [a] defendant successfully rebuts the presumption of illegality, the burden of producing additional evidence of anti-competitive effect shifts to the [FTC], and merges with the ultimate burden of persuasion."  FTC v. H.J. Heinz Co., 246 F.3d at 715.  The burden of persuasion remains with the FTC to show that the merger will substantially lessen competition.  See United States v. Baker Hughes, Inc., 908 F.2d at 983; United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1110 (N.D. Cal. 2004).

11.    Analyzing a merger's likely competitive effects requires the court to determine: (i) the relevant product market in which the merger should be assessed; (ii) the relevant geographic market in which the merger should be assessed; and (iii) the merger's probable effect on competition in the relevant product and geographic markets.  See FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 117 (citing United States v. Marine Bancorporation, 418 U.S. at 618-23).

### 1.    **Relevant Product Market.**

12.    "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  When one product is a reasonable substitute for the other, is should be included in the same relevant product market even though the products are not the same.  See FTC v. Cardinal Health, Inc., 12 F. Supp. 2d at 46.  A product is a reasonable substitute for another when the demand for it increases in response to an increase in the price for the other.  See id.  "Because the ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the relevant market rests on a determination of available substitutes."  Id. (citing United States v. E.I.

du Pont de Nemours & Co., 351 U.S. 377, 395 (1956), and Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc., 714 F.2d 351, 356 (4th Cir. 1983)).

### 2.    Relevant Geographic Market.

13.    "A properly defined geographic market includes potential suppliers who can readily offer consumers a suitable alternative to the defendant's services." FTC v. Tenet Health Care Corp., 186 F.3d at 1052.  The relevant geographic market must correspond to the commercial realities of the industry and be economically significant.  See FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 123 (quoting Brown Shoe Co. v. United States, 370 U.S. at 336-37).  The Merger Guidelines, while not binding on the federal courts, also provide guidance for determining the relevant geographic market. According to the Merger Guidelines, the relevant geographic market should be "a region such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that region would profitably impose at least a 'small but significant and nontransitory' increase in price, holding constant the terms of sale for all products produced elsewhere." Merger Guidelines at § 1.21 (quoted in FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 123).  A properly defined relevant geographic market can be determined only after a factual inquiry into the commercial realities consumers face.  See FTC v. Tenet Health Care Corp., 186 F.3d at 1052.  While a relevant geographic market must be defined sufficiently for the court to understand where competition is threatened, it need not be defined with "scientific precision" or "by metes and bounds as a surveyor would lay off a plot of ground."  FTC v. Cardinal Health, Inc., 12 F. Supp. 2d at 49 (internal quotations and citations omitted).

### 3.    Effect on Competition.

14.    "[A] [c]ourt must begin its analysis of assessing the likely competitive effects of the

proposed merger by determining the market shares of the merging firms and the level of concentration in the relevant market." Id. at 52.  While significant, however, statistics concerning market share and concentration are not conclusive indicators of anti-competitive effects.  See FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 130 (quoting United States v. Gen. Dynamics Corp., 415 U.S. 486, 498 (1974)).  A district court must make a broad inquiry -- "the economic concept of competition, rather than any desire to preserve rivals as such, is the lodestar that shall guide . . . application of the antitrust laws."  FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 130 (quoting Hosp. Corp. of Am. v. FTC, 807 F.2d at 1389).

Generally, the FTC can establish a prima facie case by demonstrating that the merged entity will have a significant share of the relevant market.  See FTC v. Swedish Match, 131 F. Supp. 2d at 166 (citing United States v. Phila. Nat'l Bank, 374 U.S. 321, 363 (1963)).  In United States v. Phila. National Bank, the Supreme Court of the United States held that a post-merger market share of thirty percent could establish a presumption of lack of competition.  See 374 U.S. at 364.

15.    Market concentration may also serve as an indicator of anti-competitive effects.  The HHI provides a statistical measure of market concentration in a relevant market.  See FTC v. Cardinal Health, Inc., 12 F. Supp. 2d at 53.  According to the Merger Guidelines, a market with an HHI of less than 1000 is unconcentrated, a market with an HHI of 1000 to 1800 is moderately concentrated, and a market with an HHI greater than 1800 is highly concentrated.  See Merger Guidelines at § 1.5 (cited in FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 124).  Under the Merger Guidelines, an increase in HHI of 100 points or more in a post-merger moderately concentrated market potentially raises significant competitive concerns.  See Merger Guidelines at § 1.5 (cited in FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 124).  An increase in HHI of 50 points or more in a post-

merger highly concentrated market may raise significant competitive concerns.  See Merger Guidelines at § 1.5 (cited in FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 124).  The Merger Guidelines presume that a merger producing an increase in HHI of more than 100 in a highly concentrated market will likely create or enhance market power, or facilitate its exercise.  See Merger Guidelines at § 1.51 (cited in FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 124).  The Merger Guidelines provide that, other things being equal, cases falling just above or just below a stated HHI threshold present comparable competitive issues.  See Merger Guidelines at § 1.5 (cited in FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 124).

16.     The Supreme Court has not established a fixed threshold at which an increase in market concentration triggers antitrust laws.  See FTC v. Swedish Match, 131 F. Supp. 2d at 167.

**B.     WEIGHING OF THE EQUITIES.**

17.     If the FTC establishes a likelihood of success on the merits, a presumption in favor of issuing a preliminary injunction arises.  See FTC v. Swedish Match, 131 F. Supp. 2d at 172 (citing FTC v. PPG Indus., Inc., 798 F.2d 1500, 1507 (D.C. Cir. 1986)).  Even if such a presumption is present, however, courts must still consider the equities.  See FTC v. Swedish Match, 131 F. Supp. 2d at 172 (citing FTC v. Weyerhaeuser Co., 665 F.2d 1072, 1082 (D.C. Cir. 1981)).  Absent a likelihood of success on the merits, equities will not, by themselves, justify the granting of a preliminary injunction.  See FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 159 (citing FTC v. PPG Indus., Inc., 798 F.2d at 1508).  A court must consider both private and public equities.  See FTC v. Swedish Match, 131 F. Supp. 2d at 172.  Private equities generally include the corporate interests of the companies involved in the proposed merger.  See id.  Public equities are the interests of the public, either in allowing the merger to proceed or in preventing it.  See id.  "The primary public

interest favoring preliminary injunctive relief in a Section 13(b) case, which Congress specifically contemplated, is the effective enforcement of the antitrust laws."  FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 159 (citing FTC v. H.J. Heinz Co., 246 F.3d at 726).  A proper assessment of the equities includes "the potential benefits, both public and private, that may be lost by enjoining a merger." FTC v. Swedish Match, 131 F. Supp. 2d at 172 (citing FTC v. Weyerhaeuser Co., 665 F.2d at 1082). "[If] the [FTC] demonstrates a likelihood of ultimate success, a counter showing of private equities alone [will] not suffice to justify denial of a preliminary injunction barring the merger."  FTC v. Weyerhaeuser Co., 665 F.2d at 1083.

## II.    CONCLUSIONS OF LAW SPECIFIC TO THIS CASE.

18.    The Clayton Act is concerned with mergers that may have demonstrable and substantial anti-competitive effects.  Remote possibilities are not sufficient to satisfy the test set forth in Section 7.  While this standard does not require certainty of adverse competitive effect, it requires more than conjecture or speculation.

19.    The defendant's burden varies based on the strength of the FTC's prima facie case. "[L]ess of a showing is required from defendants to rebut a less-than-compelling prima facie case." FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 129.  See FTC v. H.J. Heinz Co., 246 F.3d at 725; United States v. Baker Hughes, Inc., 908 F.2d at 991 ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully.").

20.    While the Court is convinced that the merger will eliminate a rival, Giant and Western do not compete strongly or directly against each other, but in a competitive market that includes a number of suppliers and potential suppliers.  As a result, the FTC's showing of a prima facie case is weak.

21.     The FTC's prima facie case is based on current market concentration and an increase in market concentration from the merger.  While the market is concentrated, however, it remains competitive.  The increase in market concentration is not likely to decrease that competition.  While the market is concentrated, and while the merger will increase that concentration, the Court is not convinced the market is significantly more concentrated than other inland markets or that the merger will significantly increase market concentration in the relevant market.  Thus, while the FTC has convinced the Court that the current market is concentrated, that the merger will increase market concentration, that Giant and Western are competitors, and that these circumstances give rise to a presumption of anti-competitive effect, the presumption is a weak one, because the FTC does not include all current bulk suppliers and because there is not a strong rivalry between Giant and Western.

22.     The Defendants have rebutted any presumption of anti-competitive effect based on market concentration by showing that the existing suppliers are able to, and likely will, constrain the Defendants.

23.     The weakness in the FTC's case is also shown in the difficulty it has in establishing a relevant geographic market.  While there is no dispute in the relevant product market, the FTC has drawn the geographic market too tightly and excluded suppliers and potential suppliers, and not recognized the economic reality of current suppliers reacting to any anti-competitive move by Western and of currently marginal suppliers increasing their roles in the northern New Mexico market.  While the Court agrees with the FTC that the relevant geographic market is limited to firms that provide bulk supply in northern New Mexico, the FTC's proposed market does not include all current suppliers of bulk supply of gasoline to Albuquerque.

-98-

24.     Only after the relevant markets have been defined is it possible to determine whether a "substantial" lessening of competition is probable.  The failure to properly define a relevant market may lead to the dismissal of a section 7 claim.  See FTC v. Freeman Hosp., 69 F.3d 260, 268 (8th Cir. 1995)("Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning."); United States v. Engelhard Corp., 970 F. Supp. 1463, 1485 (M.D. Ga. 1997)(denying a request for a permanent injunction, because, "[i]f the market is incorrectly defined, the market shares will have no meaning").  "Not only is the proper definition of the relevant . . . market the first step in this case, it is also the key to the ultimate resolution of this type of case, since the scope of the market will necessarily impact any analysis of the anti-competitive effects of the transaction."  United States v. Sungard Data Sys., Inc., 172 F. Supp. 2d 172, 181 (D.D.C. 2001).

25.     The FTC has not defined the market with precision.  The FTC leaves out some suppliers that the Court believes should be included, and the Defendants attempt to leave out Western.  Despite the disagreement about which sales are relevant to calculating market shares, and the concomitant difficulty in calculating market shares, there is no disagreement that the Albuquerque market is concentrated.  The Court relies heavily on this agreement, rather than on the parties' calculations of market shares, to find that the FTC has met its prima facie case.  The difficulty that the FTC has had in making its prima facie case, and the Court's concern about the FTC's showing, contributes to the weakness of the FTC's prima facie case.

26.     The FTC did not establish a likelihood of success on the merits by presenting evidence showing that the proposed merger would create an anti-competitive effect via coordination.

27.     The FTC attempted to establish a likelihood of success on the merits by submitting

evidence demonstrating that the proposed merger would have an anti-competitive impact through unilateral effects.  The Court finds that the FTC made a prima facie showing that the market is presently concentrated and that the proposed merger would result in an increase in market concentration.

28.     The Court finds further, however, that the Defendants produced evidence rebutting the FTC's prima facie showing and the presumption of substantially lessened competition that accompanies it.  The Defendants submitted evidence undermining the predictive value of the FTC's market-share statistics.  The Defendants have shown that "the [FTC's] market share statistics give an inaccurate account of the merger's probable effects on competition in the relevant market."  FTC v. H.J. Heinz Co., 246 F.3d at 715 (internal quotations and alterations omitted).  The Defendants have rebutted the presumption with non-statistical market evidence raising doubts about the persuasive quality of the FTC's statistics and with evidence of economic circumstances undermining the predictive validity of the FTC's statistical presentation.  The most important rebuttal evidence includes the economic circumstances regarding the likelihood of entry.  The efficiencies of the merger have not played a determinative role in this case.

29.     The FTC has not convinced the Court that, but for the merger, Giant's increased crude supply will lead to lower prices in northern New Mexico.

30.     The FTC has not convinced the Court that, if Giant attempted to put a large amount of new volume into the market, other Albuquerque suppliers will not back out some of their supply.  Historical increases in supply have not, to date, resulted in lower prices.

31.     The Court believes that terminal access does not significantly constrain bulk supply into Albuquerque.  The Court also believes that pipeline space and trucking costs constrain bulk

-100-

supply into Albuquerque, but does not believe that these two constraints are as prohibitive as the FTC suggests.  The Court believes that current bulk gasoline suppliers that supply northern New Mexico by pipeline are responsive and can be responsive to price changes.

32.    If the new Western-Giant entity were to cut production, the Court is convinced that other firms will increase volume.  Expansion plans by existing market participants will make it possible for existing suppliers to increase supply sufficiently to offset any attempt by Giant to reduce its shipments by five daily truckloads.

33.    While bulk supply transported by truck will not, in the foreseeable future, replace bulk supply transported by pipeline, trucked product makes up an important segment of the Albuquerque market.  Indeed, all of the Giant-refined oil is trucked.  Bulk supply transported by truck is a sufficient alternative to constrain the merging Defendants.

34.    Furthermore, while the Court concludes that it should, in determining the relevant geographic market and in determining whether the FTC has met its prima facie case by showing concentration in that market, limit its consideration to firms that currently provide bulk supply in that market, once the FTC makes that showing, the Court believes it can consider the entry of new competitors .  Here, the prospect of entry by new competitors is not speculative, but likely if there is an increase in prices in Albuquerque.  Because the amount of new Giant refinery production is relatively small -- 980 bpd -- this prospect of entry need not be great, but in this case, is sufficient to obviate any anti-competitive effects of the acquisition.  Thus, new entry sufficient to constrain anti-competitive conduct by the merging Defendants is likely.

35.    After analyzing the evidence the parties submitted concerning the relevant product market, the relevant geographic market, and the proposed merger's probable effect on competition

in those markets, the Court has determined that the proposed merger is not likely to create anti-competitive effects.

36.     The FTC has not shown that, if this matter moves to an administrative proceeding, there is a substantial likelihood it will be able to prove the merger may lessen competition in violation of Section 7 of the Clayton Act.  Specifically, the FTC has not convinced the Court that there is a substantial likelihood it will prove the acquisition will result in a significant lessening of competition.

37.     The FTC has not demonstrated a "substantial lessening will be 'sufficiently probable and imminent' to warrant relief." FTC v. Arch Coal, Inc., 329 F. Supp. 2d at 115 (quoting United States v. Marine Bancorporation, 418 U.S. at 618).  The FTC has not shown "a reasonable probability that the proposed transaction would substantially lessen competition in the future." FTC v. Cardinal Health, Inc., 12 F. Supp. 2d at 45.

38.     The FTC has shown that substantial impairment of competition is a possibility, but has not shown that the impairment is a reasonable probability.

39.     The Court concludes that the FTC has not demonstrated a likelihood of succeeding on the merits of its Clayton Act case in an administrative proceeding.

40.     The Court has had access to information the FTC did not have when it initiated these proceedings, and if and when the FTC reviews that information, the Court believes that it will agree the acquisition will not result in a significant lessening of competition.

41.     Because the FTC has not established a likelihood of success on the merits and because equities alone cannot justify the relief sought, the Court will deny the request for a preliminary injunction.

42.     Injunctive relief is not necessary in this case to protect the public's interest.

43.     The Court also notes that, except for Conway Oil, no customers have expressed concern about the merger.  Moreover, while one of the state's assistant attorney generals is a special assistant to the FTC, the State of New Mexico is not a party to this case.

**IT IS ORDERED** that Plaintiff's Motion for a Preliminary Injunction is denied.

**IT IS FURTHER ORDERED** that the temporary restraining order, contained within the Court's April 13, 2007 Memorandum Opinion and Order, enjoining the proposed merger between Western and Giant, is dissolved.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Deyonna Young
  Assistant Attorney General
Litigation Division (Antitrust)
Office of the New Mexico
  Attorney General
Special Deputy to the Federal
  Trade Commission
Albuquerque, New Mexico

-- and --

Michael Bloom
  Director of Litigation
Thomas J. Lang
  Senior Litigation Counsel
John Andrew Singer
Peter Richman
  Litigation Counsel
Bureau of Competition
Federal Trade Commission
Washington, D.C.

-103-

*Attorneys for the Plaintiff*

Andrew G. Schultz
Henry M. Bohnhoff
Patrick M. Shay
Thomas A. Outler
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque, New Mexico

      *Attorneys for the Defendants*

Lowry Barfield
Western Refining, Inc.
El Paso, Texas

-- and --

Marc G. Schildkraut
Michael P.A. Cohen
David F. Smutney
Heller Ehrman, LLP
Washington, D.C.

      *Attorneys for Defendants Paul L. Foster*
        *and Western Refining, Inc.*

Kim H. Bullerdick
Giant Industries, Inc.
Scottsdale, Arizona

-- and --

Hugh R. Whiting
Tom D. Smith
Jones Day
Washington, D.C.

      *Attorneys for Defendant Giant Industries, Inc.*